<pre>
 1                  UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2
                      16-80107-CR-HURLEY/HOPKINS
 3

 4
    UNITED STATES OF AMERICA,      )
 5                                 )
                  PLAINTIFF,       )
 6                                 )
             VS.                   )
 7                                 )
    GREGORY HUBBARD,               )
 8  DAYNE ANTANI CHRISTIAN,        )
    DARREN ARNESS JACKSON,         )
 9                                 )
                  DEFENDANTS.      )
10  _____ )

11                  (TRANSCRIPT BY DIGITAL RECORDING)

12

13          TRANSCRIPT OF ARRAIGNMENT AND PRETRIAL DETENTION

14  HEARING HAD BEFORE THE HONORABLE DAVE LEE BRANNON, IN WEST PALM

15  BEACH, PALM BEACH COUNTY, FLORIDA, ON JULY 27, 2016, IN THE

16  ABOVE-STYLED MATTER.

17
    APPEARANCES:
18
    FOR THE GOVERNMENT:  EDWARD NUCCI, A.U.S.A.
19                       500 SOUTH AUSTRALIAN AVENUE, SUITE 400
                         WEST PALM BEACH, FL 33401 - 561 820-8711
20
                         LAWRENCE SCHNEIDER, ESQ.
21                       UNITED STATES DEPARTMENT OF JUSTICE
                         1400 NEW YORK AVENUE NW
22                       WASHINGTON, DC 20005 - 202 616-4940

23                  CARL SCHANZLEH, RPR - CM
                    CERTIFIED COURT REPORTER
24                    9960 SW 4TH STREET
                    PLANTATION, FLORIDA 33324
25                       954 424-6723
</pre>

```
 1  APPEARANCES CONTINUED:

 2  FOR DEFENDANT HUBBARD: ANTHONY J. NATALE, A.F.P.D.
                           150 WEST FLAGLER STREET, SUITE 1500
 3                         MIAMI, FL 33130 - 305 533-4246

 4  FOR DEFENDANT         MICHAEL SALNICK, ESQ.
    CHRISTIAN:            1645 PALM BEACH LAKES BLVD., SUITE 1000
 5                        WEST PALM BEACH, FL 33401 - 561 471-1000

 6  FOR DEFENDANT JACKSON: JULIE P. VIANALE, ESQ.
                           VIANALE & VIANALE
 7                         5550 GLADES ROAD, SUITE 500
                           BOCA RATON, FL 33431 - 561 392-4750

 8

 9

10
                         TABLE OF CONTENTS
11
    WITNESSES:                     DIRECT  CROSS REDIRECT RECROSS
12
    BRIAN KING .............................. 27      51
13
                         INDEX TO EXHIBITS
14
    EXHIBITS                   MARKED FOR        RECEIVED
15                             IDENTIFICATION   IN EVIDENCE

16  DESCRIPTION                PAGE     LINE     PAGE     LINE

17

18

19

20

21

22

23

24

25
```

 1 (WEST PALM BEACH, PALM BEACH COUNTY, FLORIDA;  JULY 27, 2016,

 2 IN OPEN COURT.)

 3       THE COURT:  NOW THE NEXT THREE DEFENDANTS AND THE LAST

 4 THREE DEFENDANTS HERE ARE ALL INVOLVED IN ONE CASE.  DO THE

 5 PARTIES BELIEVE IT WOULD BE USEFUL TO HAVE A DETENTION HEARING

 6 AT ONE TIME ON ALL THREE?

 7       MR. NATALE:  YOUR HONOR, I AM REQUESTING -- ANTHONY

 8 NATALE FROM THE FEDERAL PUBLIC DEFENDER'S OFFICE ON BEHALF OF

 9 MR. HUBBARD, AND WE ARE REQUESTING OUR PDT HEARING TODAY.

10       THE COURT:  OKAY.  VERY WELL.

11       WELL, LET ME GO AHEAD AND CALL THE CASE.

12       THIS IS CASE NUMBER 16-80107, UNITED STATES VERSUS

13 GREGORY HUBBARD, UNITED STATES VERSUS DAYNE ANTANI CHRISTIAN,

14 AND UNITED STATES VERSUS DARREN ARNESS JACKSON.

15       WOULD COUNSEL STATE THEIR APPEARANCES, PLEASE, FOR THE

16 RECORD.

17       MR. NUCCI:  EDWARD NUCCI ON BEHALF OF THE UNITED

18 STATES.  WITH ME AT COUNSEL TABLE IS TRIAL ATTORNEY LARRY

19 SCHNEIDER FROM THE COUNTER TERRORISM SECTION AT MAIN JUSTICE,

20 NATIONAL SECURITY DIVISION.  AND ALSO AT COUNSEL TABLE IS

21 SPECIAL AGENT BRIAN KING OF THE FBI.

22       THE COURT:  GOOD MORNING, FOLKS.

23       MR. SCHNEIDER:  GOOD MORNING, YOUR HONOR.

24       MR. NATALE:  GOOD MORNING, YOUR HONOR.  ANTHONY NATALE

25 FROM THE FEDERAL PUBLIC DEFENDER'S OFFICE ON BEHALF OF

1  MR. HUBBARD.  WE ARE HERE TODAY TO DO THE ARRAIGNMENT AS WELL

2  AS THE PRETRIAL DETENTION HEARING.  HE IS PRESENT IN COURT.

3         THE COURT:  GOOD MORNING, MR. NATALE.

4         MR. NATALE, IS THIS GOING TO BE YOUR CASE?

5         MR. NATALE:  THIS WILL BE MY CASE, YOUR HONOR.

6         THE COURT:  VERY WELL.

7         AND GOOD MORNING TO YOU, MR. HUBBARD.

8         MR. HUBBARD:  GOOD MORNING, SIR.

9         MS. VIANALE:  GOOD MORNING, YOUR HONOR.  JULIE

10 VIANALE, AND I AM HERE AS COURT APPOINTED CJA COUNSEL ON BEHALF

11 OF MR. DARREN JACKSON.

12        WE ARE PREPARED TODAY TO GO FORWARD WITH THE

13 ARRAIGNMENT IF YOUR HONOR WISHES TO DO THAT, AND I WOULD NOTE

14 IN THAT REGARD I WOULD NOT BE AVAILABLE TO COME BACK NEXT WEEK

15 FOR THE ARRAIGNMENT.  SO I WOULD MUCH PREFER TO DO IT TODAY IF

16 THAT SUITS THE REST OF THE LAWYERS IN THE CASE AND YOUR HONOR.

17        WITH RESPECTS TO DETENTION, WE ARE GOING TO BE

18 CONSENTING AT THIS TIME TO ENTRY OF AN ORDER OF DETENTION.  WE

19 ARE NOT GOING TO BE SEEKING A HEARING ON DETENTION.  SO IN THAT

20 REGARD WE WILL NOT BE REQUIRING A HEARING TODAY.

21        THE COURT:  VERY WELL.  THANK YOU, MA'AM.

22        MR. SALNICK:  GOOD MORNING, YOUR HONOR.  MICHAEL

23 SALNICK WITH MY PARTNER JACK FUITES ON BEHALF OF DAYNE

24 CHRISTIAN.  WE'VE ENTERED A PERMANENT APPEARANCE FOR TRIAL

25 PURPOSES ONLY, YOUR HONOR.  WE WOULD BE PREPARED TO GO FORWARD

1 WITH THE ARRAIGNMENT TODAY.

2 WE ARE GOING TO DEFER ON THE DETENTION QUESTION.  IF

3 THE COURT DETERMINES AT THIS POINT TO ORDER HIM DETAINED I

4 WOULD LIKE THAT TO BE WITHOUT PREJUDICE FOR US TO SEEK A MOTION

5 TO CONSIDER HIS RELEASE BEFORE YOUR HONOR, BUT WE ARE NOT GOING

6 TO GO FORWARD WITH THAT TODAY.

7 THE COURT:  OKAY.  SO, AS I UNDERSTAND IT,

8 MISS VIANALE AND MR. SALNICK, YOU ALL ARE GOING TO BE

9 STIPULATING TO DETENTION TODAY BUT RESERVING THE RIGHT TO COME

10 BACK LATER.

11 MS. VIANALE:  PRECISELY.

12 MR. SALNICK:  YES, YOUR HONOR.

13 THE COURT:  OKAY.  VERY WELL.

14 AND, MR. NATALE, YOUR CLIENT WOULD LIKE HIS DETENTION

15 HEARING TODAY.

16 MR. NATALE:  YES, YOUR HONOR.

17 THE COURT:  VERY WELL.

18 NOW, THIS IS A JUDGE HURLEY CASE AS WELL.  AND AS

19 YOU'VE HEARD ME SAY IN THE OTHER CASES INVOLVING JUDGE HURLEY

20 THERE IS AN ISSUE WITH RESPECT TO THE WAIVER OF SPEEDY TRIAL

21 RIGHTS.

22 I WANT TO GIVE YOU ALL AN OPPORTUNITY TO CONSULT WITH

23 YOUR CLIENTS ON THAT TO SEE WHETHER YOU WANT TO DO THAT OR NOT.

24 WHATEVER YOU WANT TO DO IS ABSOLUTELY FINE WITH ME, AND IF YOU

25 NEED MORE TIME TO DO THAT I CAN GIVE YOU MORE TIME.

1          THE ARRAIGNMENT IN THIS CASE WAS ORIGINALLY SET FOR

2  FRIDAY BUT THE INDICTMENT WAS RETURNED YESTERDAY.  AND SO, WE

3  CAN GO AHEAD AND DO THE ARRAIGNMENT TODAY IF PEOPLE ARE READY

4  TO PROCEED.  IF NOT THEN WE WILL LEAVE IT ON FRIDAY.

5          MR. NATALE:  YOUR HONOR, ON BEHALF OF MR. HUBBARD, I

6  HAVE DISCUSSED THE ISSUE WITH HIM REGARDING SPEEDY TRIAL AND

7  HIS DESIRE TO ENTER HIS NOT GUILTY PLEA TODAY.

8          WE WILL NOT WAIVE SPEEDY TRIAL AND WE WOULD LIKE TO GO

9  FORWARD, AS I SAID EARLIER, WITH THE DETENTION HEARING AND HIS

10 ARRAIGNMENT.

11         THE COURT:  VERY WELL.  WE WILL GO FORWARD WITH BOTH

12 ON MR. HUBBARD, AND WE WILL MAKE AN ENTRY IN THE COURT MINUTES

13 THAT HE IS NOT WAIVING HIS SPEEDY TRIAL RIGHT.

14         MRS. VIANALE, DO YOU NEED SOME TIME TO DISCUSS THINGS

15 OVER WITH MR. JACKSON?

16         MS. VIANALE:  I WOULD NEED JUST A MINUTE, YES.

17         THE COURT:  THAT'S FINE.

18         AND, MR. SALNICK, DO YOU NEED SOME TIME TO DISCUSS

19 THINGS WITH --

20         MR. SALNICK:  I WOULD, YOUR HONOR, YES.

21         THE COURT:  VERY WELL.

22         I WILL GO AHEAD AND GIVE YOU SOME TIME TO DO THAT, AND

23 JUST IN AN EFFORT TO KEEP THINGS MOVING ALONG SINCE YOU ALL

24 THREE ARE THE LAST THREE THINGS ON THE CALENDAR WE'LL JUST KIND

25 OF SIT IN PLACE RIGHT NOW TO GIVE YOU THE TIME TO CONSULT.  LET

```
 1    ME KNOW WHEN YOU'RE READY.

 2            THE COURT:  MR. SALNICK, SIR, ARE YOU READY ON BEHALF

 3    OF MR. CHRISTIAN?

 4            MR. SALNICK:  I JUST WANT TO TALK TO -- CHAT WITH

 5    MR. NUCCI FOR ONE SECOND.

 6            THE COURT:  VERY WELL.

 7            ARE YOU READY NOW, SIR?

 8            MR. SALNICK:  WE ARE READY, JUDGE.

 9            THE COURT:  VERY WELL.

10            MISS VIANALE, ARE YOU READY, MA'AM?

11            MS. VIANALE:  YES, MA'AM.  YES, SIR, RATHER.

12            THE COURT:  VERY WELL.  OKAY.

13            WITH RESPECT TO A SPEEDY TRIAL, MISS VIANALE, WHAT

14    DOES MR. JACKSON GOING TO DO?

15            MS. VIANALE:  WE ARE NOT GOING TO WAIVE AT THIS TIME.

16            THE COURT:  VERY WELL.  WE WILL MAKE AN ENTRY ON THE

17    COURT MINUTE THAT HE IS NOT WAIVING SPEEDY TRIAL.

18            AND, MR. SALNICK, WITH RESPECT TO MR. CHRISTIAN?

19            MR. SALNICK:  JUDGE, AT THIS TIME HE'S NOT GOING TO

20    WAIVE.

21            THE COURT:  VERY WELL.  THEN WE WILL MAKE A NOTE IN

22    THE COURT MINUTE IN THAT REGARD AS WELL.

23            LET'S GO AHEAD AND ARRAIGN ALL THREE DEFENDANTS AT THE

24    SAME TIME.

25            THEY CAN REMAIN SEATED AT COUNSEL TABLE.  I'M JUST
```

  1 | GOING TO ASK YOU WHEN YOU SPEAK TO MAKE SURE THAT YOU SPEAK
  2 | INTO THE MICROPHONE.

  3 |         MR. HUBBARD, YOU'RE BEFORE THE COURT THIS MORNING,
  4 | SIR, ON AN INDICTMENT WHICH CHARGES YOU IN COUNT ONE WITH
  5 | CONSPIRING TO PROVIDE MATERIAL SUPPORT TO A FOREIGN TERRORIST
  6 | ORGANIZATION, AND IN COUNT TWO WITH ATTEMPT TO ATTEMPTING TO
  7 | PROVIDE MATERIAL SUPPORT TO A FOREIGN TERRORIST ORGANIZATION.

  8 |         I'M NOT ASKING YOU WHETHER ANY OF THAT IS TRUE OR NOT,
  9 | SIR.  BUT DO YOU UNDERSTAND WHAT IT IS THAT YOU ARE GOING
 10 | CHARGED WITH?

 11 |         MR. HUBBARD:  YES, SIR.

 12 |         THE COURT:  AND HAVE YOU RECEIVED A COPY OF THE
 13 | INDICTMENT, SIR?

 14 |         MR. HUBBARD:  YES, SIR.

 15 |         THE COURT:  VERY WELL.

 16 |         AND, MR. CHRISTIAN.  SIR, YOU ARE CHARGED IN COUNT ONE
 17 | WITH CONSPIRING TO PROVIDE MATERIAL SUPPORT TO A FOREIGN
 18 | TERRORIST ORGANIZATION, IN COUNT TWO WITH ATTEMPTING TO PROVIDE
 19 | MATERIAL SUPPORT TO A FOREIGN TERRORIST ORGANIZATION, AND IN
 20 | COUNTS THREE THROUGH SIX WITH BEING A FELON IN POSSESSION OF A
 21 | FIREARM, SIR.

 22 |         ONCE AGAIN, SIR, I'M NOT ASKING YOU WHETHER ANY OF
 23 | THAT IS TRUE BUT DO YOU UNDERSTAND WHAT IT IS THAT YOU ARE
 24 | BEING CHARGED WITH?

 25 |         MR. CHRISTIAN:  YES, SIR.

1           THE COURT:  VERY WELL.

2           AND, MR. JACKSON.  SIR, IN COUNT ONE YOU ARE CHARGED

3   WITH CONSPIRING TO PROFFERED MATERIAL SUPPORT TO A FOREIGN

4   TERRORIST ORGANIZATION, AND IN COUNT IN TWO COUNT WITH

5   ATTEMPTING TO PROVIDE MATERIAL SUPPORT TO A FOREIGN TERRORIST

6   ORGANIZATION.

7           SIR, I'M NOT ASKING YOU WHETHER THAT'S TRUE OR NOT.

8   DO YOU UNDERSTAND WHAT IT IS THAT YOU ARE CHARGED WITH?

9           MR. JACKSON:  YES.

10          THE COURT:  AND, MR. JACKSON, DID YOU RECEIVE A COPY

11  OF THE INDICTMENT, SIR?

12          MR. JACKSON:  YES.

13          THE COURT:  MR. CHRISTIAN, DID YOU RECEIVE A COPY OF

14  THE INDICTMENT, SIR?

15          CHRISTIAN:  YES, SIR.

16          THE COURT:  VERY WELL.

17          GOVERNMENT, WHAT'S THE POTENTIAL MAXIMUM AND ANY

18  MINIMUM SENTENCES THAT EACH OF THE DEFENDANTS ARE LOOKING AT?

19          MR. NUCCI:  YOUR HONOR, AS TO COUNT ONE AND TWO, THE

20  TERRORISM CHARGES, THE MAXIMUM SENTENCE IS 20 YEARS

21  IMPRISONMENT, A FINE OF $250,000 AND THREE YEARS SUPERVISED

22  RELEASE.

23          AS TO THE FIREARM COUNTS REGARDING DEFENDANT --

24          THE COURT:  HOW MANY YEARS OF SUPERVISED RELEASE, SIR?

25          MR. NUCCI:  THREE.

 1          THE COURT:  OKAY.  I THINK THE PENALTY SHEET SAYS A

 2  LITTLE BIT DIFFERENT.

 3          MR. NUCCI:  I KNOW THE PENALTY SHEET WOULD BE WRONG.

 4  I HAVE CHANGED IT --

 5          THE COURT:  OKAY.

 6          MR. NUCCI:  -- AND IT'S NOW BACK TO THE WAY IT WAS

 7  ORIGINALLY.

 8          THE COURT:  VERY WELL.

 9          MR. NUCCI:  WE WILL FILE A NEW ONE.

10          THE COURT:  OKAY.

11          MR. NUCCI:  AS TO THE FIREARM COUNTS, THE MAXIMUM

12  PENALTY IS 10 YEARS IMPRISONMENT, A $250,000 FINE AND THREE

13  YEARS SUPERVISED RELEASE.

14          THE COURT:  VERY WELL.  AND THERE IS A $100 SPECIAL

15  ASSESSMENT FOR EACH OFFENSE FOR WHICH SOMEBODY IS CONVICTED, IS

16  THAT CORRECT, SIR.

17          MR. NUCCI:  THAT IS CORRECT, YOUR HONOR.  THANK YOU.

18          THE COURT:  VERY WELL.

19          MR. HUBBARD, DO YOU UNDERSTAND, SIR, THE POTENTIAL

20  MAXIMUM SENTENCES THAT YOU ARE LOOKING AT?

21          MR. HUBBARD:  YES, SIR.

22          THE COURT:  AND DO YOU UNDERSTAND WHAT SUPERVISED

23  RELEASE IS?

24          MR. HUBBARD:  YES, SIR.

25          THE COURT:  VERY WELL.

```
 1            AND, MR. CHRISTIAN, DO YOU UNDERSTAND, SIR, THE

 2   POTENTIAL MAXIMUM SENTENCES THAT YOU ARE LOOKING AT?

 3            MR. CHRISTIAN:  YES, SIR.

 4            THE COURT:  AND DO YOU UNDERSTAND WHAT SUPERVISED

 5   RELEASE IS?

 6            MR. CHRISTIAN:  YES, SIR.

 7            THE COURT:  VERY WELL.

 8            AND, MR. JACKSON, DO YOU UNDERSTAND THE POTENTIAL

 9   MAXIMUM SENTENCE, SIR?

10            MR. JACKSON:  YES, I DO.

11            THE COURT:  AND DO YOU UNDERSTAND WHAT SUPERVISED

12   RELEASE IS?

13            MR. JACKSON:  YES, I DO.

14            THE COURT:  VERY WELL.

15            ARE WE THEN READY TO PROCEED WITH THE ARRAIGNMENT?

16            MR. NATALE:  YOUR HONOR, ON BEHALF OF MR. HUBBARD, WE

17   ARE.

18            WE WOULD WAIVE FORMAL READING OF THE INDICTMENT, ENTER

19   A PLEA OF NOT GUILTY, REQUEST A TRIAL BY JURY AND THAT YOUR

20   HONOR ISSUE THE STANDING DISCOVERY ORDER.

21            THE COURT:  THANK YOU, SIR.

22            MS. VIANALE:  YOUR HONOR, WITH RESPECT TO MR. JACKSON,

23   WE HAVE RECEIVED THE INDICTMENT, WE WAIVE THE PUBLIC READING.

24   MR. JACKSON ENTERS A PLEA OF NOT GUILTY TO THE CHARGES IN THE

25   INDICTMENT.  WE WOULD REQUEST ENTRY OF THE STANDING DISCOVERY
```

1  ORDER AND TRIAL BY JURY.

2          THE COURT:  THANK YOU, MA'AM.

3          MR. SALNICK:  JUDGE, WITH RESPECT TO MR. CHRISTIAN WE

4  WOULD ENTER PLEAS OF NOT GUILTY AS TO ALL COUNTS.  WE WOULD ASK

5  FOR A TRIAL BY JURY AND WE WOULD ASK FOR THE ENTRY OF THE

6  STANDING DISCOVERY ORDER.

7          THE COURT:  VERY WELL.

8          I WILL ACCEPT EVERYBODY'S WAIVER OF MY READING OF THE

9  INDICTMENT WORD FOR WORD HERE IN OPEN COURT, ENTER PLEAS OF NOT

10 GUILTY FOR EACH DEFENDANT FOR EACH AND EVERY COUNT IN WHICH

11 THEY ARE CHARGED AND THEIR DEMANDS FOR A TRIAL BY JURY.

12          I WILL ENTER THE STANDING DISCOVERY ORDER IN THIS

13 CASE, WHICH IS AN ORDER FROM THE COURT TO BOTH SIDES TELLING

14 BOTH SIDES TO EXCHANGE INFORMATION SO THE CASE CAN BE PREPARED

15 TO GO FORWARD.

16          AND I AM GOING TO REQUIRE THE ATTORNEYS WITHIN 14 DAYS

17 OF TODAY'S DATE TO CONFER AND FILE A JOINT STATUS REPORT THAT

18 INDICATES THAT THAT PROCESS IS UNDERWAY AND BEING COMPLETED.

19          LET'S GO AHEAD AND TALK TO MR. CHRISTIAN FIRST AND

20 THEN MR. JACKSON ABOUT THEIR STIPULATING TO DETENTION AT THIS

21 POINT, RESERVING THEIR RIGHT TO COME BACK LATER, AND THEN WE

22 WILL GO FORWARDS WITH MR. HUBBARD'S DETENTION HEARING.

23          MR. CHRISTIAN, SIR, DO YOU UNDERSTAND THAT THE

24 GOVERNMENT WANTS TO HOLD YOU IN PRETRIAL DETENTION UNTIL THIS

25 CASE IS OVER?

 1              MR. CHRISTIAN:  YES, SIR.

 2              THE COURT:  OKAY.  HAVE YOU HAD THE OPPORTUNITY TO

 3  DISCUSS THIS WITH MR. SALNICK?

 4              CHRISTIAN:  YES SIR.

 5              THE COURT:  AND HAS HE GIVEN YOU THE BENEFIT OF HIS

 6  ADVICE AND COUNSEL, SIR?

 7              MR. CHRISTIAN:  YES, SIR.

 8              THE COURT:  ARE YOU SATISFIED WITH MR. SALNICK?

 9              MR. CHRISTIAN:  YES, SIR.

10              THE COURT:  I BELIEVE MR. SALNICK HAS REPRESENTED YOU

11  IN THE PAST, HAS HE NOT, SIR?

12              MR. CHRISTIAN:  YES, SIR.

13              THE COURT:  VERY WELL.  AND DO YOU UNDERSTAND THAT BY

14  STIPULATING TO DETENTION YOU WILL ESSENTIALLY BEING AGREEING TO

15  STAY IN CUSTODY UNTIL SUCH TIME AS YOU COME BACK BEFORE ME FOR

16  A DETENTION HEARING.  DO YOU UNDERSTAND THAT, SIR?

17              MR. CHRISTIAN:  YES, SIR.

18              THE COURT:  OKAY.  AND ALL YOU HAVE TO DO TO GET THAT

19  HEARING IS TO HAVE YOUR ATTORNEY FILE A MOTION, YOU WILL COME

20  BACK AND YOU WILL GET A FULL HEARING.  DO YOU UNDERSTAND THAT,

21  SIR?

22              MR. CHRISTIAN:  YES, SIR.

23              THE COURT:  SIR, ARE YOU UNDER THE INFLUENCE OF ANY

24  DRUGS OR ALCOHOL?

25              MR. CHRISTIAN:  NO, SIR.

```
 1            THE COURT:  HAVE YOU TAKEN ANY MEDICATION IN THE LAST
 2   24 HOURS?
 3            MR. CHRISTIAN:  NO, SIR.
 4            THE COURT:  ANYBODY PROMISE YOU ANYTHING IN RETURN FOR
 5   STIPULATING TO DETENTION?
 6            MR. CHRISTIAN:  NO, SIR.
 7            THE COURT:  ANYBODY THREATENED YOU IN ANY WAY TO GET
 8   YOU TO STIPULATE TO DETENTION?
 9            MR. CHRISTIAN:  NO, SIR.
10            THE COURT:  ARE YOU STIPULATING TO DETENTION FREELY
11   AND VOLUNTARILY AFTER CONSULTING WITH YOUR ATTORNEY BECAUSE YOU
12   THINK IT IS THE SMART THING TO DO IN THIS CASE?
13            MR. CHRISTIAN:  YES, SIR.
14            THE COURT:  VERY WELL.
15            GOVERNMENT, ANY FURTHER INQUIRY YOU WANTED ME TO MAKE
16   ABOUT MR. CHRISTIAN'S STIPULATION TO DETENTION?
17            MR. NUCCI:  NO, YOUR HONOR.
18            THE COURT:  MR. SALNICK, ANY FURTHER INQUIRY YOU THINK
19   I NEED TO MAKE?
20            MR. SALNICK:  NO, YOUR HONOR.
21            THE COURT:  VERY WELL.  THEN I AM GOING TO ACCEPT
22   MR. CHRISTIAN'S STIPULATION TO DETENTION AT THIS TIME.
23            THE GOVERNMENT I BELIEVE IS PROCEEDING ON BOTH
24   GROUNDS, IS IT NOT?
25            MR. NUCCI:  IT IS, YOUR HONOR.
```

```
 1            THE COURT:  VERY WELL.  BOTH SIDES CAN RETAIN THE
 2   PRETRIAL SERVICES REPORT, AND I WILL RELY ON THE INDICTMENT,
 3   AND THE COMPLAINT, AND THE PRETRIAL SERVICES REPORT IN
 4   FASHIONING A DETENTION ORDER.
 5            MR. CHRISTIAN, YOU HAVE BEEN
 6            MR. SALNICK:  I DIDN'T SEE THAT, JUDGE, UNLESS IT'S
 7   FLOATING AROUND --
 8            THE COURT:  THE PRETRIAL SERVICES REPORT?
 9            MR. SALNICK:  YEAH.  OKAY.
10            THE COURT:  OKAY.
11            MR. SALNICK:  THANK YOU.
12            THE COURT:  MISS VIANALE, DO YOU HAVE A COPY OF THE
13   PRETRIAL SERVICES REPORT?
14            MS. VIANALE:  I DO, YOUR HONOR.
15            THE COURT:  VERY WELL.  BOTH SIDES CAN, AS I SAID,
16   RETAIN THE PRETRIAL SERVICES REPORT UNTIL SUCH TIME AS THERE IS
17   A DETENTION HEARING IN THIS CASE.  SO WE WILL BE DOING AN ORDER
18   IN THAT REGARD RELYING UPON THOSE THINGS.
19            MR. CHRISTIAN HAS BEEN ARRAIGNED.  WE'VE DEALT WITH
20   THE DETENTION ISSUE.  ANYTHING FURTHER FOR MR. CHRISTIAN THIS
21   MORNING?
22            MR. SALNICK:  NO, YOUR HONOR.
23            MR. NUCCI:  NO, YOUR HONOR.
24            THE COURT:  OKAY.
25            MR. CHRISTIAN, YOU WILL GO WITH THE MARSHALS NOW.
```

1   GOOD LUCK TO YOU, SIR.

2            MR. CHRISTIAN:  THANK YOU.

3            THE COURT:  MR. JACKSON, SIR.

4            DO YOU UNDERSTAND, SIR, THAT THE GOVERNMENT WANTS TO

5   HOLD YOU IN PRETRIAL DETENTION UNTIL THIS CASE IS OVER AS WELL?

6            MR. JACKSON:  YES, SIR.

7            THE COURT:  AND DO YOU UNDERSTAND THAT BY STIPULATING

8   TO DETENTION ESSENTIALLY WHAT YOU'RE DOING IS YOU'RE AGREEING

9   YOU'RE GOING TO STAY IN DETENTION RIGHT NOW AND UNTIL SUCH TIME

10  AS YOU COME BACK IN FRONT OF ME FOR A FULL DETENTION HEARING.

11  DO YOU UNDERSTAND THAT?

12           MR. JACKSON:  YES, SIR.

13           THE COURT:  DO YOU UNDERSTAND THAT AT THAT DETENTION

14  HEARING YOU MIGHT GET A BOND OR YOU MIGHT STILL BE HELD IN

15  CUSTODY.  DO YOU UNDERSTAND THAT, SIR?

16           MR. JACKSON:  YES, SIR.  YES, I DO.

17           THE COURT:  HAVE YOU HAD THE OPPORTUNITY TO DISCUSS

18  THIS WITH MISS VIANALE?

19           MR. JACKSON:  YES, I DID.

20           THE COURT:  HAS SHE GIVEN YOU THE BENEFIT OF HER

21  ADVICE AND COUNSEL?

22           MR. JACKSON:  YES.

23           THE COURT:  ARE YOU SATISFIED WITH THE ADVICE SHE HAS

24  GIVEN YOU IN THAT REGARD?

25           MR. JACKSON:  ABSOLUTELY.

1        THE COURT:  ARE YOU UNDER THE INFLUENCE OF ANY DRUGS

2   OR ALCOHOL, SIR?

3        MR. JACKSON:  NO.

4        THE COURT:  HAS ANYBODY THREATENED YOU IN ANY WAY,

5   SIR, TO GET YOU TO STIPULATE TO DETENTION?

6        MR. JACKSON:  NO.

7        THE COURT:  ANYBODY PROMISE YOU ANYTHING IN RETURN FOR

8   STIPULATING TO DETENTION?

9        MR. JACKSON:  NO.

10       THE COURT:  ARE YOU STIPULATING TO DETENTION FREELY

11  AND VOLUNTARILY BECAUSE AFTER TALKING WITH MISS VIANALE YOU

12  THINK IT'S THE SMART THING TO DO IN THIS CASE RIGHT NOW?

13       MR. JACKSON:  ABSOLUTELY.

14       THE COURT:  GOVERNMENT, ANY FURTHER INQUIRY YOU WANT

15  ME TO MAKE?

16       MR. NUCCI:  NO, YOUR HONOR.

17       THE COURT:  MISS VIANALE, ANY FURTHER INQUIRY YOU

18  THINK I NEED TO MAKE?

19       MS. VIANALE:  NO, YOUR HONOR.

20       THE COURT:  VERY WELL.  THEN I AM GOING TO ACCEPT

21  MR. JACKSON'S STIPULATION TO DETENTION AS BEING FREE, KNOWING

22  AND VOLUNTARY AFTER HAVING HAD THE OPPORTUNITY TO CONSULT WITH

23  VERY COMPETENT COUNSEL WITH WHOM HE HAS INDICATED THAT HE IS

24  SATISFIED.

25       I WILL RELY UPON THE COMPLAINT, THE INDICTMENT, AND

 1  THE PRETRIAL SERVICES REPORT IN FASHIONING AN APPROPRIATE

 2  ORDER.  THE ORDER WILL REFLECT THE FACT THAT HE HAS NOT HAD A

 3  FULL HEARING, AND HE HAS THE RIGHT TO SUCH A HEARING SHOULD HE

 4  SO REQUEST, AND BOTH SIDES CAN RETAIN THE PRETRIAL SERVICES

 5  REPORT UNTIL THAT TIME.

 6          MR. JACKSON HAS BEEN ARRAIGNED, WE'VE TAKEN CARE OF

 7  DETENTION.  ANYTHING FURTHER ON MR. JACKSON'S CASE TODAY?

 8          MR. NUCCI:  NO, YOUR HONOR.

 9          THE COURT:  MISS VIANALE?

10          MS. VIANALE:  NO, YOUR HONOR.  THANK YOU.

11          THE COURT:  THANK YOU VERY MUCH.

12          MR. JACKSON, YOU WILL GO WITH THE MARSHALS NOW.  GOOD

13  LUCK TO YOU, SIR.

14          MR. JACKSON:  THANK YOU, SIR.

15          THE COURT:  YOU'RE WELCOME, SIR.

16          AND ARE WE READY TO PROCEED WITH MR. HUBBARD?

17          MR. NUCCI:  YES, YOUR HONOR.

18          THE COURT:  VERY WELL.

19          MR. NUCCI:  YOUR HONOR, THE UNITED STATES IS SEEKING

20  PRETRIAL DETENTION OF THE DEFENDANT GREGORY HUBBARD ON THE

21  GROUNDS THAT HE IS BOTH -- THAT BASICALLY THAT THERE IS NO

22  CONDITION OR COMBINATION OF CONDITIONS THAT WOULD REASONABLY

23  ASSURE HIS APPEARANCE AS DIRECTED FOR TRIAL OR THE SAFETY OF

24  THE COMMUNITY.

25          AS THE COURT KNOWS UNDER THE BAIL REFORM ACT, SECTION

1  3142(E)(3)(C), AS A FEDERAL CHARGE OFFENSE OF TERRORISM THERE

2  IS A REBUTTABLE PRESUMPTION THAT IN FACT THIS COURT CANNOT

3  FASHION ANY COMBINATION OF CONDITIONS THAT WOULD ASSURE HIS

4  APPEARANCE OR THE SAFETY OF THE COMMUNITY AND HE SHOULD BE

5  DETAINED.  SO WE WILL START WITH THAT.

6          WHAT THE EVIDENCE SHOWS, AND I'M GOING TO RELY NINETY

7  PERCENT ON THE AFFIDAVIT, THE CRIMINAL COMPLAINT AFFIDAVIT OF

8  SPECIAL AGENT BRIAN KING WHO IS PRESENT IN THE COURTROOM.  IT'S

9  NOW A MATTER OF PUBLIC RECORD.  I THINK IT'S DOCKET ENTRY

10 NUMBER ONE ON THE DOCKET.  AND --

11          THE COURT:  YOU WANT ME TO TAKE JUDICIAL NOTICE OF

12 BOTH THE CRIMINAL COMPLAINT AND THE PRETRIAL SERVICES REPORT?

13          MR. NUCCI:  YES, YOUR HONOR.

14          THE COURT:  VERY WELL.

15          MR. NUCCI:  AND I INCORPORATE BY REFERENCE THE --

16 OBVIOUSLY THE CRIMINAL COMPLAINT AFFIDAVIT IN ITS ENTIRETY.

17 I'M NOT GOING TO BELABOR THE FACT BY GOING THROUGH EVERY

18 PARAGRAPH THAT I THINK SUPPORTS THE GOVERNMENT'S POSITION THAT

19 NO BOND SHOULD BE SET, BUT I MAY HIGHLIGHT SOME OF THOSE.

20          THE COURT:  VERY WELL.  I WILL TAKE JUDICIAL NOTICE OF

21 THOSE TWO DOCUMENTS.

22          MR. NUCCI:  YOUR HONOR, THE -- WHAT THAT COMPLAINT

23 SHOWS, AND WHAT THE EVIDENCE WOULD SHOW IS THAT DEFENDANT

24 HUBBARD IS BASICALLY A FULLY RADICALIZED INDIVIDUAL WHO

25 AMBITION WAS TO FIGHT JIHAD, TO JOIN ISIS, TO GET TO SYRIA, AND

1  TO WAGE WAR ON HIS OWN AMERICAN COUNTRYMEN.

2       FROM THE OUTSET OF THIS CASE GOING BACK TO I THINK IT

3  WAS MAY OF 2015, MR. HUBBARD SENT TO A CONFIDENTIAL HUMAN

4  SOURCE IN THIS CASE A ONE HUNDRED PAGE BASIC MANIFESTO OF THE

5  ISLAMIC STATE, WHICH SET OUT WHAT ISIS CONTROLS, HOW THE

6  MEMBERS OF ISIS GET IN AND OUT OF SYRIA.  IT WAS A TRAINING

7  MANUAL.  IT DEFINED THE ISLAMIC STATE AS JIHAD AND THE RIFLE

8  ALONE.  NO NEGOTIATIONS, NO CONFERENCES, NO DIALOGUES.

9       ON PAGE 25 OF THE MANUAL THAT MR. HUBBARD SENT TO THE

10  INFORMANT IT STATED UNDER TRAINING, ONCE SOMEONE COMPLETES THE

11  TRAINING CAMP THEY WILL BE SENT BACK TO -- THEY WILL BE SENT TO

12  BATTLE TO FIGHT OR TO GAIN MARTYRDOM.

13       IF YOU LOOK AT THE COMPLAINT YOU WILL SEE -- THE

14  AFFIDAVIT, YOU WILL SEE NUMEROUS INSTANCES OF BOTH HUBBARD AS

15  WELL AS HIS CODEFENDANTS IN CONJUNCTION WITH THE CONFIDENTIAL

16  INFORMANT LISTENING TO SQUEEZES TO INDOCTRINATION,

17  INDOCTRINATING SERMONS OF BOTH ANWAR AL-AWLAKI, A RADICAL

18  CLERIC OUT OF YEMEN WHO WE THINK WAS KILLED IN 2011,

19  AL-BAGHDADI, THE LEADER OF ISIS, AS WELL AS AGNANY, ONE OF

20  THEIR SPOKESPEOPLE, ALL DESCRIBING JIHAD BOTH OVERSEAS AS WELL

21  AS IN AMERICA.  THE TENETS WHERE THAT YOU COULD ALMOST DO MORE

22  DAMAGE AND HELP ISIS BY FIGHTING IN THE HOMELAND AND KILLING

23  YOUR CITIZENS.

24       LET ME REFERENCE JUST A FEW OF THE PARAGRAPHS OF THE

25  COMPLAINT WHERE -- AND SADLY AS AMERICA WAS LEARNING ALMOST ON

1 A WEEKLY BASIS OF TERRORISTS ATTACKS, SOME ISIS, SOME ISIS

2 INSPIRED, SOME LOAN WOLVES, THE DEFENDANT WOULD COMMENT ON

3 THEM; THERE WAS SAN BERNARDINO, THERE WAS BATON ROUGE, IT WAS

4 NICE, FRANCE, IT WAS FORT HOOD, TEXAS, IT WAS ORLANDO.

5　　　　LET'S LOOK AT PARAGRAPH 19 OF THE AFFIDAVIT. THIS WAS

6 THE SAN BERNARDINO MASSACRE IN DECEMBER OF 2015. HUBBARD AND

7 THE INFORMANT WERE EATING AT A LOCAL RESTAURANT WHEN A

8 TELEVISION WAS BROADCASTING NEWS OF THE MASS SHOOTING IN

9 SAN BERNARDINO. THE NEWS REPORTED THE ATTACK HAD BEEN

10 COMMITTED BY ISIL. HUBBARD ASKED THE INFORMANT WHAT HE

11 THOUGHT, AND THE INFORMANT REPLIED BASICALLY THAT HE THOUGHT IT

12 WAS A TRAGEDY.

13　　　　AS REPORTED -- AND AGAIN THESE CONVERSATIONS WERE BY

14 AND LARGE TAPE RECORDED. HUBBARD GREW UPSET, STOOD UP

15 SUDDENLY, AND LOUDLY EXPLAINED THAT HE DID NOT CARE HOW MANY

16 AMERICANS AND INFIDELS WERE KILLED. HUBBARD LATER EXPRESSED TO

17 THE CS THAT HE DID NOT CARE IF PEOPLE NOTICED HIS OUTBURST.

18　　　　FORWARD TO PAGE -- OR TO PARAGRAPH 27. HUBBARD STATES

19 ON FEBRUARY 17TH, 2016, TO THE INFORMANT THAT HE WANTED TO

20 BRING AMERICA TO ITS KNEES. THAT IT WOULD BE A BIG SPLASH IF

21 THE SOCCER TEAM, WHICH BECAME A CODE FOR THEM IN TALKING ABOUT

22 ISIS, IF THE SOCCER TEAM WOULD ATTACK THE PENTAGON.

23　　　　HUBBARD ADDED THAT IT WOULD BE A GLORIOUS DAY FOR THE

24 MOVEMENT. HE ALSO MENTIONED THE WHITE HOUSE AS A POSSIBLE

25 TARGET. HUBBARD MADE AN EXPLODING SOUND WHEN TALKING ABOUT THE

 1  PENTAGON ATTACK AND STATED HE WAS TALKING ABOUT NOT LEAVING A

 2  PEBBLE IN THE PARKING LOT.

 3          WHEN THE CHS MENTIONED THAT THE PENTAGON WAS A

 4  DIFFICULT TARGET HUBBARD RESPONDS THAT THE WHITE HOUSE SHOULD

 5  BE ATTACK ON A DAY WHEN THERE IS A HIGH PROFILE MEETING AND

 6  MADE ANOTHER EXPLOSION FOR EMPHASIS.

 7          PARAGRAPH 26, WHICH IS THE PARAGRAPH BEFORE, HUBBARD

 8  RAISES THE ISSUE OF KILLING CIVILIANS, AMERICAN CIVILIANS

 9  BEFORE LEAVING THE UNITED STATES.  HE DISCUSSES THIS WITH

10  CODEFENDANT CHRISTIAN, AND CHRISTIAN SAYS THAT HE WAS HIMSELF

11  WAS THINKING ABOUT TAKING SOMEONE OUT.  BARRED ASKED CHRISTIAN,

12  YOU COULD TAKE ANYBODY OUT BECAUSE LEGALLY YOU ARE AT WAR WITH

13  THEM, THAT IS ISIS AT WAR WITH THE WEST.

14          CHRISTIAN RESPONDED, IF YOU KNOW FOR SURE THE PERSON

15  IS GOING TO FIGHT YOUR BROTHERS THEN YOU CAN STOP THEM.

16          HUBBARD REFERRED TO THE FORT HOOD MASS SHOOTING

17  COMMENTING, THAT IS WHAT THE BROTHER DID OUT IN TEXAS AND HE

18  WAS ABSOLUTELY RIGHT.

19          TURNS TURNING TO PARAGRAPH 53 OF THE AFFIDAVIT, IT

20  CONTINUES.  HUBBARD ALONG WITH CODEFENDANT JACKSON LEARN FROM

21  THE INFORMANT THAT THERE HAD BEEN A TERRORIST ATTACK IN NICE,

22  FRANCE.  THEY HAD BEEN UNAWARE OF THIS.

23          WHEN THE INFORMANT PROVIDED DETAILS OF THE ATTACK --

24  AND AGAIN AS THE COURT WILL RECALL THIS WAS A VAN THAT WAS

25  DRIVEN OVER -- YOU KNOW, I FORGET HOW MANY DIED, I THINK -- YOU

1 KNOW, THERE WERE HUNDREDS INJURED, MANY DEATHS.  THE VAN WAS

2 BASICALLY WEAPONIZED THAT WENT THROUGH A CROWD CELEBRATING

3 BASTILLE DAY.  WHEN HUBBARD HEARD THE DETAILS HE EXCLAIMED IN

4 ARABIC, PRAISE BE TO ALLAH.

5        IN COMBINATION WITH THIS MAN'S INDOCTRINATION WITH HIS

6 DESIRE NOT ONLY TO TRAVEL TO ISIS TO FIGHT FOR THEM, BUT IF HE

7 HAS TO ON THE HOMELAND FRONT TO KILL PEOPLE, YOU HAVE HIS

8 ABILITY TO NOT ONLY SHOOT WEAPONS BUT TO ACQUIRE THEM.

9        ON NUMEROUS OCCASIONS IN THE AFFIDAVIT YOU WILL SEE

10 THAT HUBBARD GOES OUT AND TRAINS WITH WEAPONS, SOME HE BRINGS.

11 I NOTE ON JUNE 16TH WHEN HE SHOT AT A RANGE -- THAT'S PARAGRAPH

12 47 -- HUBBARD BROUGHT FOUR WEAPONS TO THE SHOOTING, THREE

13 PISTOLS AND A RIFLE.

14        ON OCCASION HE WOULD GO OUT TO THE CORBETT WILDLIFE

15 MANAGEMENT AREA WITH THE INFORMANT AND A CODEFENDANT TO SHOOT.

16 HE WAS A FORMER MARINE SO HE'S TRAINED IN -- OBVIOUSLY IN

17 FIREARMS.

18        THE IMPORT FROM THE AFFIDAVIT IS THAT THE AK .47 IS

19 BASICALLY THE WEAPON OF CHOICE, THE ASSAULT RIFLE.  AND ON JULY

20 9TH AT THE CORBETT WILDLIFE REFUGE THEY TRAINED FOR -- HOW TO

21 SHOOT, FIRE, BREAK DOWN THE AK .47.

22        SOMETHING WHICH IS NOT IN THE CRIMINAL COMPLAINT THAT

23 I DON'T WANT TO FORGET TO MENTION IS THAT AT ONE POINT HUBBARD

24 TALKED ABOUT BEFORE HE LEFT THE UNITED STATES FOR SYRIA MAKING

25 A BOMB.  HE AND CODEFENDANT JACKSON TALKED TO THE INFORMANT AND

1 ASKED HIM IF HE KNEW HOW TO MAKE A BOMB.  AND HUBBARD STATED

2 THAT HE WANTED THE BOMB BECAUSE HE WANTED TO USE IT TO KILL

3 POLICE OFFICERS BEFORE HE LEFT FOR SYRIA.  THAT WAS ON OR ABOUT

4 JULY 7TH OF 2016.

5        A WEEK LATER HUBBARD ADVISED THAT HE HAD CHANGED HIS

6 MIND, HE NO LONGER WANTED TO FOLLOW THROUGH WITH THE BOMBING

7 PLOT BECAUSE HE DIDN'T WANTED TO RISK GETTING CAUGHT AND

8 COMPROMISING HIS PLANS TO TRAVEL OVERSEAS.

9        HUBBARD HAS -- HAD NO REAL INTENTION OF COMING BACK TO

10 THE UNITED STATES.  AS SAID IN THE -- AS SET OUT IN THE

11 COMPLAINT IN TERMS OF CERTAINLY EVIDENCE THAT HE IS A FLIGHT

12 RISK, HUBBARD HAD ALREADY -- HE WAS BASICALLY HOMELESS AT ONE

13 POINT, WAS CRASHING WITH CODEFENDANT JACKSON AT AN APARTMENT IN

14 WEST PALM WITH JACKSON'S FATHER.

15        AS THE AFFIDAVIT STATES, IN MAY -- LATE MAY WITH THE

16 INFORMANT HE TOOK ALL HIS PERSONAL BELONGINGS UP TO A STORAGE

17 SHED IN ALBANY, GEORGIA, WITH THE -- AND WAS LEAVING REALLY FOR

18 GOOD.

19        RIGHT BEFORE -- I THINK IT WAS TWO DAYS BEFORE HE LEFT

20 HE GAVE A LETTER THAT HE WANTED EVENTUALLY TO SEND TO HIS

21 SISTERS AFTER HE LEFT, HE GAVE IT TO THE INFORMANT AND THE

22 LETTER SAYS, HI, BETTY:  I HOPE THIS FINDS YOU WELL.  THANK YOU

23 ALL YOU HAVE DONE FOR ME.

24        SKIPPING DOWN, I'VE DECIDED TO MOVE ABROAD TO ANOTHER

25 COUNTRY ON THIS WIDE EARTH.  BY THE TIME YOU RECEIVE THIS I

 1  WILL BE WELL ON MY WAY.  I FAIL TO SEE ANY GOOD IN THE PATH

 2  THIS COUNTRY AND THE A GENDER OF THOSE AT ITS HELM.

 3       IN ADDITION TO THE VARIOUS LECTURES THAT ARE SET OUT

 4  IN THE AFFIDAVIT, AND I GUESS THIS IS -- THIS IS WHAT THE

 5  INTERNET BRINGS US, THERE ARE NUMEROUS PARAGRAPHS WHERE THEY

 6  WERE WATCHING ACTUAL VIDEOS OF BE HEADINGS OF PEOPLE BY ISIS

 7  MEMBERS.

 8       WHEN YOU TAKE ALL THIS TOGETHER -- I CAN'T THINK OF A

 9  MORE -- A BETTER CASE THAT SAYS WHAT POSSIBLE -- DESPITE THE

10  REBUTTABLE PRESUMPTION, WHAT POSSIBLE CONDITIONS OF RELEASE

11  COULD YOU FASHION THAT, NUMBER ONE, WOULD ASSURE HIS

12  APPEARANCE.

13       HE IS BASICALLY HOMELESS, CRASHING WITH SOMEONE.  HE'S

14  GOTTEN RID OF ALL OF HIS GOODS IN A SHED.  HE WRITES A LETTER

15  AND SAYS THAT HE MAY NEVER COME BACK.  HE DOESN'T LIKE THIS

16  COUNTRY.  THERE IS NOTHING TO KEEP HIM HERE.

17       AND WHAT COULD YOU FASHION TO KEEP THIS COMMUNITY

18  SAFE?  I MEAN, THE AFFIDAVIT YOU'RE READING IT, IT'S CHILLING.

19  THE VIDEOS HE WATCHES, THE SERMONS HE WATCHES.  TO SEE HIS OWN

20  COUNTRYMEN KILLED IN BATON ROUGE, THE POLICE OFFICE, THE LAW

21  ENFORCEMENT KILLED AND HE PRAISES ALLAH FOR THE DEATHS OF HIS

22  OWN COUNTRYMEN.  HE SAYS, THE FIGHT IS TAKEN TO THE HOMELAND IN

23  A WAR.  IT'S JUSTIFIED TO KILL CIVILIANS.

24       HE DOESN'T -- AND THE MAN IS COMFORTABLE AROUND GUNS.

25  HE HAS ACCESS TO GUNS.  AND AS WE KNOW, NOWADAYS YOU DON'T NEED

 1 A GUN.  YOU CAN GO OUT WITH A KNIFE, YOU COULD USE YOUR CAR AS

 2 A WEAPON.  HE IS A VOID ENEMY IS THE UNITED STATES.  SO WHAT

 3 CONDITIONS YOU COULD POSSIBLY IMPOSE ON HIM SHORT OF

 4 INCARCERATION THAT WOULD GIVE US SOME SATISFACTION THAT THE

 5 CITIZENS OF THE UNITED STATES, THE COMMUNITY IS SAFE I DON'T

 6 KNOW THEM.

 7         SO, YOU KNOW, FOR THESE REASONS I'M ASKING THAT YOU

 8 HOLD HIM IN PRETRIAL DETENTION UNTIL TRIAL.

 9         THE COURT:  THANK YOU, SIR.

10         DO YOU HAVE AN AGENT AVAILABLE FOR CROSS-EXAMINATION?

11         MR. NUCCI:  OF COURSE, YOUR HONOR.

12         THE COURT:  VERY WELL.

13         MR. NUCCI:  I ALWAYS TRAVEL WITH ONE.

14         THE COURT:  VERY WELL.

15         MR. NATALE, DO YOU WISH TO CROSS-EXAMINE THE AGENT,

16 SIR.

17         MR. NATALE:  YES, I DO, YOUR HONOR.

18         THE COURT:  VERY WELL.

19         MR. NUCCI:  DO YOU WANT HIM TO TAKE THE STAND, YOUR

20 HONOR?

21         THE COURT:  YES, SIR.

22         MR. NUCCI:  SPECIAL AGENT KING.

23         THE CLERK:  RAISE YOUR RIGHT HAND, PLEASE.

24         (WITNESS SWORN)

25         THE WITNESS:  I DO.

```
 1              THE CLERK:  HAVE A SEAT, SIR.

 2              STATE YOUR FULL NAME AND SPELL YOUR LAST NAME FOR THE

 3   RECORD.

 4              THE WITNESS:  BRIAN KING, K-I-N-G.

 5              THE COURT:  THANK YOU, SIR.

 6              YOU MAY INQUIRE.

 7                         BRIAN KING,

 8   BEING DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

 9                      CROSS EXAMINATION

10   BY MR. NATALE:

11   Q.  AGENT KING, YOU HEARD THE PROFFER THAT WAS GIVEN BY THE

12   GOVERNMENT?

13   A.  YES, I DID.

14   Q.  DO YOU ADOPT ALL OF THE STATEMENTS THAT WERE MADE BY THE

15   GOVERNMENT AS BEING TRUE AND ACCURATE?

16   A.  YES, I DO.

17   Q.  IS THERE ANYTHING WHICH THE PROSECUTOR SAID WHICH WAS

18   SOMETHING THAT YOU WOULD LIKE TO EMBELLISH UPON, CORRECT,

19   CHANGE, OR IN ANY WAY MODIFY?

20   A.  THERE WAS ONLY ONE DATE WHICH HE MISSTATED.  IT WAS JUNE

21   8TH I BELIEVE WAS -- HE REFERRED TO JUNE 16TH THAT MR. HUBBARD

22   BROUGHT THOSE WEAPONS.  IT WAS JUNE 8TH.  THAT WAS THE ONLY --

23   Q.  OF WHAT YEAR, SIR?

24   A.  OF 2016.

25   Q.  NOW, YOU BEGAN THIS INVESTIGATION IN WHEN?
```

1  A.   THIS CONSPIRACY WITH CODEFENDANTS JACKSON, AND CHRISTIAN,

2  AND MR. HUBBARD'S SUPPORT FOR ISIS AND INTENTION TO TRAVEL TO

3  JOIN ISIS IN SYRIA BECAME OF CONCERN TO US IN APRIL OF 2015.  I

4  WAS NOT HERE AT THE TIME.  OTHER CASE AGENTS WORKED IT UNTIL

5  DECEMBER OF 2015, AT WHICH POINT I BECAME THE LEAD CASE AGENT.

6        MR. NUCCI:  YOUR HONOR, IF I COULD, WITH ONE

7  CLARIFICATION.

8        I MEAN, WE'RE TALKING ABOUT THIS INVESTIGATION AND WE

9  ARE NOT GOING INTO ANY OTHERS THAT MIGHT HAVE BEEN EXTANT.

10       THE AGENT HAS BEEN INSTRUCTED THAT WE'RE -- WHAT IS

11 DECLASSIFIED IS THIS -- ON THIS COMPLAINT.  AND, YOU KNOW, WE

12 ARE NOT SAYING OR DENYING THERE WERE OTHER INVESTIGATIONS AT

13 OTHER TIMES GOING INTO THIS DEFENDANT BUT WE ARE TALKING ABOUT

14 THIS ONE HERE.

15       THE COURT:  VERY WELL.

16       MR. NATALE:  YOUR HONOR, I DON'T PLAN TO GET INTO THAT

17 OTHER THAN THE ISSUE OF RISK OF FLIGHT IN THE EXTENT OF TIME

18 FROM WHICH THEY ALLEGEDLY HAD A CONCERN OF MR. HUBBARD TO THE

19 TIME WHEN THEY ACTUALLY DECIDED TO REMOVE THIS PERSON WHO THEY

20 HAVE DESCRIBED AS BEING AS DANGEROUS AS ANYONE COULD BE.  I

21 THINK IT'S RELEVANT TO THE RISK OF FLIGHT.

22 BY MR. NATALE:

23 Q.  SIR, PRIOR TO APRIL OF 2015, DO YOU KNOW IF IN ANY WAY,

24 SHAPE, OR FORM MR. HUBBARD WAS A SUSPECT OR A TARGET, OR A

25 PERSON OF INTEREST FOR ANY ILLEGAL ACTIVITY?

1           MR. NUCCI:  AGAIN, YOUR HONOR, THAT'S OUTSIDE THE

2    SCOPE AND I WOULD OBJECT.

3           I'M HAPPY TO STAND ON THE FACTS OF THE COMPLAINT

4    AFFIDAVIT AS TO HIS RISK OF FLIGHT.

5           THE COURT:  WELL, I UNDERSTAND THAT.  BUT WHAT I THINK

6    MR. NATALE WANTS TO GET AT IS IF THE GOVERNMENT HAS BEEN AWARE

7    OF THIS FOR SOME TIME AND HASN'T ACTED ON IT, IT MAKES THE

8    ARGUMENT THAT PERHAPS HE IS NOT A GREAT A DANGER AS HE MAY

9    APPEAR TO BE NOW.

10          MR. NATALE:  OR A RISK OF FLIGHT.

11          MR. NUCCI:  I MEAN, THAT'S A HYPOTHETICAL.

12          WHETHER I CONSIDER, YOU KNOW, THAT THEY SHOULD HAVE

13   ACTED BEFORE OR NOT IT'S WHAT THE FACTS SHOW.

14          THE COURT:  WELL, YOU GUYS ARE TRYING TO CONVINCE ME

15   THAT I SHOULD DETAIN THIS PERSON AS A DANGER TO THE COMMUNITY

16   AND A RISK OF FLIGHT.

17          I'M THE PERSON WHO HAS BEEN TO BE CONVINCED.  IT

18   DOESN'T MATTER WHETHER MR. NATALE IS CONVINCED, OR WHETHER

19   YOU'RE CONVINCED, OR WHETHER ACTUALLY FOR THAT MATTER SPECIAL

20   AGENT KING IS CONVINCED.  I'M THE ONE WHO HAS TO DECIDE WHETHER

21   I'M GOING TO TAKE MR. HUBBARD'S LIBERTY FROM HIM OR NOT.

22          THE QUESTION THAT I WOULD LIKE ANSWERED, AND I WILL GO

23   AHEAD AND PUT THE QUESTION MYSELF IS, SPECIAL AGENT KING, WHEN

24   DID MR. HUBBARD FIRST COME ON YOUR RADAR SCREEN?

25          THE WITNESSES:  YOUR HONOR, THAT INFORMATION IS

1    CLASSIFIED AND I'M NOT ALLOWED TO DISCUSS IT.

2         WITH RESPECT TO THIS CASE AT HAND, APRIL 2015 WAS

3    SIGNIFICANT IN THAT HE HAD INFORMED THE CONFIDENTIAL HUMAN

4    SOURCE OF HIS INTENTION TO TRAVEL OVERSEAS TO JOIN ISIS AND

5    SENT HIM THAT E-BOOK THAT MR. NUCCI REFERRED TO, THE ISLAMIC

6    STATE'S MANUAL, IF YOU WILL, OF HOW TO TRAVEL TO JOIN THE

7    ISLAMIC STATE.

8         I'M SORRY IF I CAN'T ANSWER --

9         THE COURT:  VERY WELL.

10        WHAT I WILL CONCLUDE FROM THAT IS THAT IT WAS SOMETIME

11   PRIOR TO APRIL 2015 THAT THE GOVERNMENT BECAME AWARE, AND

12   THAT'S AS MUCH DETAIL AS I NEED AT THIS POINT.

13   BY MR. NATALE:

14   Q.  AGENT KING, THE -- WHO MADE THE DECISION TO INTRODUCE THE

15   CONFIDENTIAL HUMAN SOURCE TO MR. HUBBARD?

16   A.  THE CONFIDENTIAL HUMAN SOURCE KNEW MR. HUBBARD SOCIALLY

17   BEFORE MR. HUBBARD EXPRESSED HIS INTENTIONS TO -- HIS SUPPORT

18   OF ISIS AND HIS INTENTION TO TRAVEL TO SYRIA TO JOIN ISIS.

19   Q.  AND HOW DID THE CONFIDENTIAL SOURCE BECOME AN OPERATIVE FOR

20   THE FBI AND HOMELAND SECURITY?

21   A.  UM --

22   Q.  WERE THEY ALREADY ONE?

23   A.  YEAH.  THE CONFIDENTIAL SOURCE HAD BEEN -- AGAIN I HAVE TO

24   BE CAREFUL WHAT I REVEAL THAT'S CLASSIFIED.

25        I CAN SAY THAT HE WAS A PREVIOUS SUBJECT CONVICTED OF

1   WIRE FRAUD THAT COOPERATED AGAINST HIS CODEFENDANT IN THAT CASE

2   AND BECAME AN INFORMANT FOR THE FBI AND HAS ACTED IN SUCH

3   CAPACITY FOR OVER EIGHT YEARS.

4   Q.  AND WAS HE COMPENSATED FOR THAT FINANCIALLY?

5   A.  YES, HE WAS.

6   Q.  AND HOW MUCH WAS HE COMPENSATED FOR TO DATE, AND HOW MUCH

7   IS HE EXPECTED TO BE COMPENSATED IN THE FUTURE?

8   A.  HE'S BEEN COMPENSATED SLIGHTLY OVER A HUNDRED THOUSAND

9   DOLLARS OVER EIGHT YEARS.  IN THE FUTURE IT WOULD DEPEND ON

10  WHAT CASE IS HE WORKS FOR US IN THE FUTURE, AND --

11  Q.  POSSIBLY THE RESULTS OF THIS CASE.

12  A.  I COULDN'T ESTIMATE THAT.

13  Q.  NOW, WAS HE DIRECTED BY ANYONE FROM LAW ENFORCEMENT TO

14  FOLLOW UP WITH MR. HUBBARD OR DID HE JUST INDEPENDENTLY SAY --

15  KNOCKED ON THE DOOR AND SAY, HEY, GUYS, I THINK I GOT

16  SOMETHING.

17          MR. NUCCI:  OBJECTION TO THE FORM OF THE QUESTION.  IF

18  YOU HAVE A DATE?

19          THE COURT:  WELL, I THINK THAT'S PART OF THE PROBLEM

20  IS --

21          MR. NATALE:  THEY DON'T WANT ME TO ASK ABOUT THE DATE,

22  JUDGE.

23          THE COURT:  OKAY.  I WILL LET YOU REPHRASE YOUR

24  QUESTION, MR. NATALE.

25  BY MR. NATALE:

1  Q.  WAS THE CONFIDENTIAL SOURCE WORKING FOR THE FBI AT THE TIME

2  THAT HE MET MR. HUBBARD?

3  A.  YES.

4  Q.  AT THE TIME THAT HE MET MR. HUBBARD WAS HE DIRECTED TO, OR

5  WAS HE POINTED, OR ENCOURAGED IN ANY WAY TO ESTABLISH A

6  RELATIONSHIP WITH MR. HUBBARD BY LAW ENFORCEMENT OR THE FBI?

7  A.  NO.

8  Q.  THIS IS SOMETHING -- AND YOU KNOW THAT FOR SURE.

9  A.  AGAIN, WHAT I CAN TALK ABOUT THAT'S NOT CLASSIFIED IS, WITH

10 RESPECT TO THIS CASE THE SOURCE REPORTED MR. HUBBARD'S SUPPORT

11 OF ISIS AND INTENTION TO TRAVEL TO SYRIA.

12         AFTER BRINGING THAT TO OUR ATTENTION WE, OF COURSE,

13 WENT BACK TO THE SOURCE AND TASKED THE SOURCE TO ELICIT MORE

14 INFORMATION ABOUT MR. HUBBARD, AND OVER THE NEXT YEAR PLUS GAVE

15 HIM SPECIFIC TASKINGS.

16 Q.  NOW, ACCORDING TO THE AFFIDAVIT, WHICH BY THE WAY YOU'RE

17 AFFIDAVIT YOU SIGNED, IS THERE ANY CHANGES OR CORRECTIONS THAT

18 YOU WOULD LIKE TO MAKE IN IT NOW?

19 A.  NO, SIR.

20 Q.  OKAY.  NOW, BASED THAT AFFIDAVIT I BELIEVE YOU SAY THAT

21 THERE IS ONE ITEM IN THE AFFIDAVIT WHICH WAS NOT SUBJECT TO

22 RECORDING, IS THAT CORRECT?

23 A.  THAT IS CORRECT.

24 Q.  NOW, YOU WOULD AGREE WITH ME THAT THERE WERE PROBABLY

25 NUMEROUS MEETINGS AND CONVERSATIONS BETWEEN MR. HUBBARD AND THE

1  CONFIDENTIAL SOURCE WHICH WERE NOT RECORDED.

2  A.  SO MEETINGS PRIOR TO APRIL OF 2015?  YES.

3       AND WITH REGARD TO MEETINGS SINCE, THE FIRST RECORDING

4  WAS INITIATED EVERY MEETING RECORDINGS WERE ATTEMPTED.  THAT

5  MEETING THAT YOU REFERRED TO IN THE AFFIDAVIT WAS ACTUALLY NOT

6  WITH MR. HUBBARD, IT WAS WITH MR. CHRISTIAN AND THE SOURCE HAD

7  THE RECORDING DEVICE WITH HIM.

8       I TALKED TO THE SOURCE ON HIS WAY TO MEET

9  MR. CHRISTIAN, REMINDED HIM TO TURN ON OUR RECORDING DEVICES

10 ARE, LIKE ALL ELECTRONICS, NOT A HUNDRED PERCENT RELIABLE AND

11 IT'S POSSIBLE THAT IT FAILED DUE TO THE BATTERY OR --

12 Q.  LET ME ASK YOU ONE FOCUS QUESTION.

13      THE TIMES WHEN MR. HUBBARD WAS AT THE CONFIDENTIAL

14 SOURCE'S HOUSE FOR DINNER, WERE THOSE CONVERSATIONS RECORDED?

15 A.  YES, THEY WERE.

16 Q.  SO, TO YOUR KNOWLEDGE, EVERY CONTACT THAT THE CONFIDENTIAL

17 SOURCE HAD AFTER APRIL OF 2015 WITH MR. HUBBARD WOULD HAVE BEEN

18 RECORDED.

19 A.  IN PERSON CONTACTS?  YES.  THE ONLY ONE I'M AWARE OF THAT

20 WAS NOT RECORDED WAS THAT JUNE 26TH, WHICH AS I STATED

21 MR. HUBBARD WAS NOT PRESENT FOR.

22      THERE WOULD LIKELY BE PHONE CALLS WITH MR. HUBBARD,

23 AGAIN WHERE THE SOURCE WAS TASKED EVERY TIME HE CALLS YOU ON

24 THE PHONE IF YOU DON'T HAVE THE RECORDING DEVICE WITH YOU, WAIT

25 UNTIL YOU HAVE IT, CALL HIM BACK.  BUT I WOULD -- I WOULD GUESS

1  THERE ARE PHONE CALLS THAT WERE NOT RECORDED.

2  Q.  OKAY.

3  A.  I DON'T KNOW WHEN OR HOW MANY.

4  Q.  NOW, I WOULD LIKE TO ASK YOU SOME QUESTIONS RELATING

5  SPECIFICALLY TO RISK OF FLIGHT.

6      DO YOU HAVE ANY INDICATION THAT MR. HUBBARD HAS ANY

7  MONEY AVAILABLE WITH WHICH HE COULD USE TO FLEE THE COUNTRY?

8  A.  I BELIEVE HE INDICATED IN MAG. COURT IN MIAMI ON FRIDAY

9  THAT HE HAD ROUGHLY TWO THOUSAND DOLLARS IN HIS BANK ACCOUNT.

10  HE ALSO CLAIMED THAT HE HAS ART WORK WITH A VALUE OF

11  APPROXIMATELY FIVE HUNDRED THOUSAND DOLLARS.  SO THAT WOULD BE

12  HIS ASSETS THAT I'M AWARE OF.

13  Q.  AND YOU'RE AWARE BECAUSE YOU AND I WERE BOTH PRESENT THERE

14  THAT THE JUDGE BASICALLY DISCREDITED THE VALUE OF THE ARTWORK

15  WHICH HE HAD BECAUSE IT IS NOT MONETARY, IT'S PAINTINGS AND

16  SCULPTURES, CORRECT?

17  A.  CORRECT.

18  Q.  AND YOU WOULD AGREE THAT MONEY THAT HE HAD FROM THE SALE OF

19  ALL OF HIS BELONGINGS WAS BASICALLY EITHER SEIZED BY THE

20  GOVERNMENT OR USED FOR HIM TO SUPPORT HIMSELF.

21  A.  ALL OF HIS ARTWORK FROM HIS STORAGE UNIT IN ALBANY,

22  GEORGIA, HAS NOT BEEN SEIZED BY THE GOVERNMENT.  HE DID LEAVE

23  ARTWORK WITH THE CONFIDENTIAL HUMAN SOURCE WHICH WE ARE NOT

24  LOOKING TO SEIZE.  AND ARRANGEMENTS I BELIEVE YOU --

25  Q.  YES, WE ARE GOING TO -- MY QUESTION THOUGH IS CASH, MONEY.

1           OTHER THAN THE TWO GRAND, HE WAS ARRESTED AND HE HAD

2   APPROXIMATELY HOW MUCH MONEY, SIX --

3   A.  EIGHT THOUSAND DOLLARS I BELIEVE.

4   Q.  ON HIM?

5   A.  ON HIS PERSON AT THE AIRPORT.

6   Q.  AND THAT'S BEEN SEIZED BY THE GOVERNMENT.

7   A.  YES, IT HAS.

8   Q.  AND WAS THERE ANY OTHER MONEY THAT HE HAD ON HIS PERSON

9   OTHER THAN THAT EIGHT THOUSAND?

10  A.  I BELIEVE HE HAD FIVE HUNDRED DOLLARS IN HIS WALLET.

11  Q.  IN HIS POCKET.  OKAY.

12          AND THAT'S ALL BEING SEIZED BY THE GOVERNMENT.

13  A.  YES, SIR.

14  Q.  YOU ALSO SEIZED HIS PASSPORT, CORRECT?

15  A.  THAT IS CORRECT.

16  Q.  NOW, REGARDING THE ISSUE OF HIS RISK OF FLIGHT.  THERE WAS

17  A TIME WHEN HE DID NOT EVEN HAVE A VALID PASSPORT, ISN'T THAT

18  RIGHT?

19  A.  THAT'S CORRECT.  I BELIEVE HE HAD AN EXPIRED PASSPORT.

20  Q.  AND THAT THE PASSPORT WHICH YOU SECURED WAS THROUGH THE

21  CONFIDENTIAL SOURCE, ISN'T THAT RIGHT?

22  A.  THAT IS CORRECT.  HE I BELIEVE WAS HOMELESS AT THE TIME AND

23  ASKED THE SOURCE TO ALLOW HIM TO USE THE SOURCE'S RESIDENTIAL

24  ADDRESS TO MAIL THE PASSPORT SO THAT IT WOULD BE RECEIVED AND

25  HE WOULD HAVE SAFEKEEPING OF IT.

1  Q.  AND THE CONFIDENTIAL SOURCE DID THAT.

2  A.  YES, HE DID?

3  Q.  WHICH WOULD BE, IN ESSENCE, MAKING -- POTENTIALLY MAKING

4  AVAILABLE TO HIM A MEANS TO LEAVE THE COUNTRY.

5  A.  YES.

6  Q.  AND THAT WAS DONE OBVIOUSLY WITH THE APPROVAL OF THE FBI OR

7  HOMELAND SECURITY.

8  A.  I THINK THE VIEW ON IT WAS THAT HE -- HE CAN DO THIS ON HIS

9  OWN.  IT'S BETTER THAT WE ARE AWARE OF IT AND AT LEAST HAVE

10  KNOWLEDGE.  AND THEN IF HE WERE TO ATTEMPT TO LEAVE THE COUNTRY

11  WE WOULD HAVE ADVANCE WARNING THROUGH THE CONFIDENTIAL HUMAN

12  SOURCE BECAUSE HE WOULD HAVE TO OBTAIN THE PASSPORT FROM THE

13  SOURCE.

14  Q.  BECAUSE WHEN THE PASSPORT WAS ACTUALLY ISSUED IT WAS SENT

15  TO THE CONFIDENTIAL SOURCE, AND THE CONFIDENTIAL SOURCE

16  ACTUALLY MAINTAINED CUSTODY OF IT.

17  A.  THAT IS CORRECT.

18  Q.  SO AT THAT POINT IN TIME HE WOULD NOT HAVE BEEN ABLE TO

19  LEAVE THE COUNTRY BECAUSE HE DIDN'T HAVE A VALID PASSPORT.

20  A.  THAT IS CORRECT.

21  Q.  IN HIS POSSESSION BECAUSE HE WAS HOMELESS.

22  A.  FOR A PERIOD OF MONTHS.  HE LATER MOVED IN WITH

23  MR. JACKSON, AND AT ANY TIME HE COULD HAVE TOLD THE

24  CONFIDENTIAL HUMAN SOURCE TO PROVIDE HIS PASSPORT.

25  Q.  AND AT ANY TIME THE GOVERNMENT COULD HAVE SORT OF PUT A

1  HOLD OR DELAYED HIS RECEIVING OR HAVING THE PASSPORT ISSUED,
2  CORRECT?
3  A.  I SUPPOSE.
4  Q.  WELL, SIR, IF THIS PERSON WAS SUSPECTED IN APRIL OF 2015,
5  AND THERE WAS ALL OF THIS SURVEILLANCE AND KNOWLEDGE, CLEARLY
6  THERE COULD HAVE BEEN A HOLD OR SOME TYPE OF DELAY PUT ON HIS
7  APPLICATION FOR THE PASSPORT.
8  A.  YES --
9  Q.  AND THAT WAS NOT DONE.
10  A.  -- THERE COULD HAVE BEEN, BUT THAT WOULD HAVE TIPPED HIM
11  OFF THAT HE WAS UNDER INVESTIGATION.  THEREFORE, AGAIN I HAVE
12  TO SAY I WAS NOT IN THE WEST PALM BEACH OFFICE OF THE FBI AT
13  THAT TIME.  BUT MY KNOWLEDGE OF IT IS THAT HE APPLIED FOR THE
14  PASSPORT FOR THE END OF AUGUST OF 2015, AND DIDN'T RECEIVE IT
15  BACK UNTIL DECEMBER OF 2015.
16      SO HAD WE INTERVENED WITH THE DEPARTMENT OF STATE AND
17  SAID, DON'T ISSUE HIM A PASSPORT, I BELIEVE THAT WOULD TIP THE
18  AVERAGE PERSON OFF THAT THEY WERE UNDER INVESTIGATION.
19  Q.  YOU MEAN YOU THINK THAT THE AVERAGE PERSON WOULD EXPECT THE
20  GOVERNMENT TO BE EXTREMELY EFFICIENT IN GETTING BACK TO THEM A
21  PASSPORT?
22  A.  NOT NECESSARILY.  BUT FOUR MONTHS IS A LONG AMOUNT OF TIME
23  TO WAIT FOR YOUR PASSPORT.
24  Q.  AND DURING THAT FOUR MONTHS WAS THERE ANY INDICATION THAT
25  MR. HUBBARD WAS BOTHERING ANYBODY OR SAYING, HEY, WHERE IS MY

1  PASSPORT?  DID IT COME IN?  DID IT COME IN?  ANY RECORDINGS OF

2  THAT?

3  A.  NO, SIR.

4  Q.  NOW, WHEN THE PASSPORT IS THERE THE CONFIDENTIAL SOURCE

5  HOLDS ON TO THE PASSPORT.

6  A.  THAT IS CORRECT.

7  Q.  NOW, YOU'RE AWARE THAT HE HAS NO PRIOR CONVICTIONS.

8  A.  THAT IS CORRECT.

9  Q.  YOU'RE AWARE, SIR -- WELL, LET ME ASK YOU THIS.

10       ARE YOU AWARE OF ANY DIRECT CONTACTS THAT MR. HUBBARD

11  HAS WITH ANYONE OUTSIDE OF THE UNITED STATES WHO COULD HELP HIM

12  TO LEAVE THIS COUNTRY, DIRECT CONTACT BETWEEN HIM AND ANYONE?

13  A.  I HAVE TO BE CAREFUL OF WHAT IS CLASSIFIED HERE.  LET ME

14  JUST ORGANIZE MY THOUGHTS IN MY HEAD.

15       I'LL JUST SAY THAT I'M AWARE OF AT LEAST ONE CONTACT

16  BUT I CAN'T GO INTO WHO THAT IS.

17  Q.  NOW, YOU WOULD AGREE THAT YOU HAVE SECURED HIS PHONE AND

18  HIS COMPUTER.

19  A.  THAT'S CORRECT.

20  Q.  AND THEY HAVE BEEN ANALYZED.

21  A.  NOT COMPLETELY.

22  Q.  WELL, BUT THEY WERE MONITORED CLEARLY DURING THE COURSE OF

23  THIS INVESTIGATION.

24  A.  THAT'S CLASSIFIED WHICH I CANNOT GO INTO.

25  Q.  OKAY.  TO THE BEST OF YOUR RECOLLECTION THAT YOU CAN

1   DISCLOSE, YOU BELIEVE THAT THERE MAY BE ONE PERSON OUTSIDE OF

2   THE UNITED STATES THAT HE HAS DIRECT CONTACT WITH.

3   A.  CORRECT.

4   Q.  NOW, ACCORDING TO THE AFFIDAVIT THE INDIVIDUAL WHO HAD

5   CONTACT WITH ISIL, OR THESE INDIVIDUALS IN THE MIDDLE EAST WAS

6   ACTUALLY ONE OF THE CODEFENDANTS.

7   A.  THAT IS CORRECT.

8   Q.  AND THAT IT WAS THAT CODEFENDANT WHO EXPLAINED THAT TO THE

9   CONFIDENTIAL SOURCE.

10  A.  IT WAS INITIALLY MR. HUBBARD THAT TOLD THE CONFIDENTIAL

11  SOURCE THAT THE CODEFENDANT WAS IN CONTACT WITH IS ISIS MEMBERS

12  IN SYRIA.  THE CODEFENDANT LATER ADMITTED THE SAME TO THE

13  SOURCE.

14  Q.  SO, THE INFORMATION THAT MR. HUBBARD HAD WOULD IT BE BASED

15  ON WHAT THE CODEFENDANT SAID?

16  A.  CORRECT.

17  Q.  AND THAT THAT CODEFENDANT THEN TOLD IT TO THE CONFIDENTIAL

18  SOURCE, AND THE CONFIDENTIAL SOURCE I'M SURE TRIED TO PROCEED

19  TO FIND OUT WHAT IF ANY CONTACT THAT WAS.

20  A.  YES.  THE SOURCE MADE ATTEMPTS TO GET FURTHER INFORMATION

21  ABOUT -- IT WAS INITIALLY ONE.  IT LATER BECAME MORE CONTACTS

22  OVERSEAS, AND THAT WAS PART OF OUR TASKING OF THE SOURCE'S --

23  Q.  NOW, THE CONFIDENTIAL SOURCE AT ONE POINT SAID THAT HE

24  MIGHT HAVE ACCESS TO SOURCES OVERSEAS.

25  A.  THAT IS CORRECT.

```
 1   Q.  AND THAT IF THE CODEFENDANT COULDN'T PROVIDE THE CONTACT

 2   THAT HE WOULD BE ABLE TO.

 3   A.  THAT IS CORRECT.

 4   Q.  AND IT'S ALSO --

 5             THE COURT:  FOR PURPOSES OF CLARITY.

 6             WHEN WE SAY THE CODEFENDANT, WHICH CODEFENDANT ARE WE

 7   TALKING ABOUT?

 8             THE WITNESS:  MR. CHRISTIAN.

 9             MR. NATALE:  MR. CHRISTIAN.

10             THE COURT:  MR. CHRISTIAN.

11             MR. NATALE:  I'M SORRY, YOUR HONOR.  I'LL TRY TO MAKE

12   IT CLEARER.

13             THE COURT:  THAT'S OKAY.  IT'S JUST THAT WE GOT TWO

14   CODEFENDANTS THOUGH.

15             MR. NATALE:  THANK YOU.

16   BY MR. NATALE:

17   Q.  AND, IN FACT, THE ESCORT OF MR. HUBBARD WHEN HE WAS

18   ARRESTED AT THE AIRPORT WAS ACTUALLY THE COOPERATING

19   CONFIDENTIAL SOURCE.

20   A.  THAT IS CORRECT.

21   Q.  AND HE WAS ACTUALLY GOING TO GO TO GERMANY WITH HIM.

22   A.  THAT IS CORRECT.

23   Q.  AND THAT PART OF THE PURPOSE OF GOING TO GERMANY WITH HIM

24   WAS BASED THE REPRESENTATIONS THAT HE MADE THAT HE WOULD HAVE

25   THE NECESSARY CONTACTS IN ORDER TO GET HIM TO GO FURTHER OR TO
```

1  THE MIDDLE EAST.

2  A.  THAT IS NOT CORRECT.

3  Q.  ARE YOU SAYING THAT AT NO TIME DID THE CONFIDENTIAL SOURCE

4  TELL HIM THAT HE HAD SOURCES WHICH HE COULD PUT, THAT IS,

5  MR. HUBBARD IN CONTACT WITH?

6  A.  THE SOURCE NEVER MADE REPRESENTATIONS OF BEING IN CONTACT

7  WITH ISIS MEMBERS IN SYRIA BECAUSE THAT WAS OUR TASKING OF HIM

8  WAS DETERMINED WHO THE SUBJECTS, THE -- MR. CHRISTIAN ADMITTED

9  SOME CONTACTS IN SYRIA, ISIS MEMBERS.  OF COURSE, THE FBI WANTS

10 TO KNOW WHO ELSE ARE SUBJECTS IN CONTACT WITH THAT WE ARE NOT

11 AWARE OF.

12       I BELIEVE THE SOURCE'S REPRESENTATIONS TO MR. HUBBARD

13 WAS THAT HE IS IN CONTACT WITH BROTHERS IN EUROPE WHO COULD

14 HELP THEM.  BUT MR. HUBBARD WANTED TO MAKE HIS WAY INTO TURKEY

15 TO MEET UP WITH ISIS SYMPATHIZERS OR SUPPORTERS IN TURKEY THAT

16 WOULD HELP THEM CROSS THE BORDER.

17 Q.  RIGHT.  BUT IT WAS CLEAR THAT THE CONFIDENTIAL SOURCE SAID

18 THAT, I CAN CONNECT YOU WITH BROTHERS, IN ESSENCE MEANING

19 PEOPLE WHO WOULD SHARE THE SAME VIEWS THAT THE CONFIDENTIAL

20 SOURCE HIMSELF WAS SAYING HE VIEWED.

21 A.  WHAT WAS REPRESENTED TO MR. CHRISTIAN IS, MR. HUBBARD HAD

22 REFERENCED AN INDIVIDUAL IN TURKEY THAT COULD HELP THEM.

23 MR. CHRISTIAN, OF COURSE, HAD LONG CLAIMED TO HAVE ISIS

24 CONTACTS IN SYRIA, WHEN TOWARDS THE END OF THIS CONSPIRACY

25 MR. CHRISTIAN DID NOT PROVIDE HIS CONTACTS IN SYRIA FOR

1  FACILITATION THE SOURCE I BELIEVE OFFERED HIS CONTACTS IN

2  EUROPE AS A BACK-UP PLAN THAT --

3  Q.  THE SOURCE MEANING THE CONFIDENTIAL SOURCE --

4  A.  THAT'S CORRECT.

5  Q.  -- OFFERED A BACKUP BECAUSE AT THAT POINT THERE WAS NO

6  CONTACT WITH ISIL THAT ANYONE HAD GIVEN TO MR. HUBBARD.

7  A.  NOT THAT WE ARE AWARE OF.  ONLY THE INDIVIDUAL IN TURKEY.

8  Q.  WELL, THE INDIVIDUAL IN TURKEY, DID THAT INDIVIDUAL CONVEY

9  TO HIM, I CAN GET YOU TO SYRIA?

10  A.  I'M NOT SURE WHAT WAS REPRESENTED BETWEEN MR. HUBBARD AND

11  THE INDIVIDUAL IN TURKEY.  BUT MR. HUBBARD MADE STATEMENTS THAT

12  THAT INDIVIDUAL COULD HELP THEM ONCE THEY GOT TO TURKEY.

13  Q.  OKAY.  BUT WE HAVE NO CONFIRMATION OF THAT, OF THE VALIDITY

14  OF THAT.

15  A.  NOT THAT I'M AWARE OF.

16  Q.  NOW, SIR, AS IT RELATES -- HE DOES HAVE FAMILY HERE IN THE

17  UNITED STATES, CORRECT?

18  A.  YES, HE DOES.

19  Q.  AND THAT ALL OF HIS BELONGINGS ARE HERE IN THE UNITED

20  STATES.

21  A.  THAT I'M AWARE OF, YES, SIR.

22  Q.  AND THAT HE -- TO YOUR KNOWLEDGE HE IS CERTAINLY NOT FLUENT

23  IN ARABIC.

24  A.  NO, SIR.

25  Q.  HE DOESN'T SPEAK ARABIC, DOES HE?

 1 A.  NO.

 2 Q.  OKAY.  AND YOU WOULD AGREE THAT HE WAS NOT A REGULAR -- I

 3 MEAN, DID HE REGULARLY ATTEND ANY MOSQUE OR MADRASSA DURING

 4 THIS ENTIRE TIME FRAME?

 5 A.  FROM THE TIME I HAVE BEEN BACK IN FLORIDA, MR. HUBBARD

 6 WOULD HAVE MOST FREQUENTLY ATTENDED A MOSQUE HERE IN PALM BEACH

 7 COUNTY.

 8 Q.  AND WAS THAT ON A REGULAR AND OFTEN BASIS OR INTERMITTENT?

 9 A.  I WOULD DESCRIBE IT AS BETWEEN INTERMITTENT AND REGULAR.

10 Q.  AND HOW MANY TIMES A MONTH?

11 A.  SEVERAL.

12 Q.  NOW, DID YOU EVER SEE HIM OBSERVING THE PRACTICE OF PRAYING

13 NUMEROUS TIMES A DAY DURING ANY OF THE VIDEOS OR SURVEILLANCE

14 THAT WAS PROVIDED, OR ANY OF THE TAPES THAT WERE ACTUALLY

15 MAINTAINED OF THESE CONVERSATIONS?

16 A.  YES.  IF THEY WOULD MEET FOR SEVERAL HOURS IN THE EVENING,

17 IF IT WAS DURING PRAYER TIMES THEY WOULD STOP THE MEETING TO

18 CONDUCT PRAYER.

19 Q.  NOW, AS IT RELATES TO HIS DANGER TO THE COMMUNITY.

20       THE FIREARMS WHICH HE HAD, HE ONLY HAD ONE OF THEM

21 WHICH WAS HIS OWN, CORRECT, THE .22 RIFLE?

22 A.  YES.  THAT FIREARM I BELIEVE HE LEFT WITH MR. CHRISTIAN

23 UPON HIS DEPARTURE.

24 Q.  AND THAT WAS ONE THAT HE HAD FOR SOME TIME, CORRECT?  AND

25 THAT RIFLE --

         1            THE COURT:  FOR THE RECORD, THE SPECIAL AGENT IS

         2   NODDING HIS HEAD YES.

         3            MR. NATALE:  YES.

         4            THE WITNESS:  I'M THINKING WHEN WE FIRST BECAME AWARE

         5   OF THAT RIFLE, AND I'M NOT AWARE OF A DATE PRIOR TO MAY 11TH

         6   THAT THE FBI WAS AWARE OF THAT, THAT WEAPON.

         7   BY MR. NATALE:

         8   Q.  WELL, LET ME PHRASE IT THIS WAY.

         9            DOES THE FBI HAVE ANY INFORMATION AS TO WHETHER THE

        10   CONFIDENTIAL SOURCE OR THE CODEFENDANTS PROVIDED HIM WITH THE

        11   .22 RIFLE?

        12   A.  MR. CHRISTIAN LOANED A .22 -- IT'S ACTUALLY A PISTOL.

        13   Q.  IT WAS A PISTOL.  IT WASN'T THE RIFLE.

        14   A.  YEAH.  BUT --

        15   Q.  I'M TALKING ABOUT THE RIFLE, SIR.

        16   A.  YEAH.  THAT WAS MR. HUBBARD'S WEAPON.  THEY NEVER LOANED IT

        17   TO HIM.

        18   Q.  NOW, THERE IS NOTHING ILLEGAL WITH HIM POSSESSING A WEAPON.

        19   A.  THAT IS CORRECT.

        20   Q.  AND, IN FACT, IN THIS ENTIRE CASE THERE WOULD BE NOTHING

        21   ILLEGAL WITH HIM SHOOTING THE WEAPON, OR THE WEAPONS THAT WERE

        22   INVOLVED IN THIS CASE.

        23   A.  IF YOU'RE TRAINING IN PREPARATION FOR TRAVELING TO SYRIA TO

        24   JOIN ISIS, THEN THAT WOULD BE UNLAWFUL.

        25   Q.  OKAY.  SO, YOU'RE TALKING ABOUT THE INTENT OF SHOOTING THE

1 FIREARMS AND NOT NECESSARILY THE ACTUAL FIRING OF THEM.

2 A.  CORRECT.

3 Q.  OKAY.  SO BUT FOR THE CIRCUMSTANCES, SHOOTING FIREARMS OUT

4 IN THE WOODS OR RANGES IS NOT ILLEGAL.

5 A.  IF --

6 Q.  IN AND OF ITSELF, BARRING --

7 A.  THERE IS FLORIDA STATE LAWS REGARDING THE DISCHARGE OF

8 FIREARMS THAT ARE NOT COMMONLY ENFORCED.  BUT YOU CAN'T JUST GO

9 INTO CORBETT WILDLIFE MANAGEMENT AREA AND SHOOT OFF FIREARMS.

10 Q.  YEAH.  AND OBVIOUSLY NO ONE WAS ALERTED TO THAT.  BUT THEY

11 WERE ALSO SHOOTING AT THE REGULAR RANGE, RIGHT?

12 A.  THAT IS CORRECT.

13 Q.  NOW, AS IT RELATES TO THE FIREARMS, THEY WERE ALL PROCURED

14 FROM SOMEONE OTHER THAN MR. HUBBARD.

15 A.  THAT IS CORRECT.

16 Q.  AND THAT THE -- THAT YOU WOULD AGREE THAT THE CONFIDENTIAL

17 SOURCE AT NO TIME DISCOURAGED THE COLLECTION OR PURCHASE OF ANY

18 FIREARMS.

19 A.  NOT THAT I'M AWARE OF.

20 Q.  NOW, PRIOR TO THIS YOU WERE AWARE THAT MR. HUBBARD HAD BEEN

21 AN ARTIST, CORRECT?

22 A.  CORRECT.

23 Q.  YOU WERE AWARE THAT HE WAS HOMELESS?

24 A.  CORRECT.

25 Q.  YOU WERE AWARE THAT HE HAD CERTAIN MENTAL HEALTH AND

```
 1  EMOTIONAL ISSUES?

 2  A.  I'M NOT SURE I'M QUALIFIED TO SAY IF HE HAD MENTAL --

 3  Q.  WELL, YOU WOULD AGREE THAT THE CONFIDENTIAL SOURCE TOLD YOU

 4  THAT, RIGHT?

 5  A.  THAT HE'S MAYBE UNSTABLE OR PRONE TO OUTBURSTS, YES.

 6  BUT --

 7  Q.  AND THAT --

 8  A.  -- MENTAL HEALTH ISSUES IS NOT --

 9  Q.  -- HE REALLY WASN'T -- YOU CAME TO LEARN THAT HE HADN'T

10  BEEN TAKING THE MEDICATION THAT HE HAD BEEN PRESCRIBED FOR HIS

11  MENTAL AND EMOTIONAL --

12  A.  THAT --

13  Q.  -- CONDITION?

14  A.  -- INFORMATION CAME AROUND WHEN I WAS NOT WORKING THE CASE,

15  BUT I AM AWARE OF SOMETHING --

16  Q.  SO YOU OBVIOUSLY LOOKED INTO IT AND YOU WERE WELL AWARE, AS

17  WAS THE CONFIDENTIAL SOURCE, THAT THIS INDIVIDUAL UNFORTUNATELY

18  HAS BEEN DIAGNOSED AND TREATED WITH CERTAIN MENTAL AND

19  PSYCHOLOGICAL DISORDERS THAT WERE TO SUCH AN EXTENT THAT HE WAS

20  ACTUALLY PRESCRIBED MEDICATION.

21  A.  AGAIN, I'M NOT AWARE OF THE SPECIFICS.  BUT I DO KNOW THAT

22  THERE WAS A PERIOD OF TIME WHEN HE WAS NOT TAKING SOME

23  MEDICATION WHICH HE WAS PRESCRIBED.

24  Q.  AND WHEN YOU STOPPED HIM AT THE AIRPORT I'M ASSUMING YOU

25  SEIZED ALL OF HIS BELONGINGS?
```

 1  A.  YES.

 2  Q.  AND THERE WAS NONE OF HIS MEDICATION IN THERE.

 3  A.  THAT IS CORRECT.

 4         THE COURT:  MR. NATALE, HAVE YOU HAD THE CHANCE TO

 5  REVIEW THE PRETRIAL SERVICES REPORT?

 6         MR. NATALE:  YES, I HAVE.

 7         THE COURT:  OKAY.

 8         MR. NATALE:  AND I REALIZE THAT THE PRETRIAL SERVICES

 9  REPORT DOES NOT HAVE ANY MENTION OF THAT.  HOWEVER, I HAVE

10  FOUND THAT --

11         THE COURT:  THAT INDICATED NO HISTORY OF MENTAL HEALTH

12  TREATMENT, NO DRUG USAGE --

13         MR. NATALE:  I UNDERSTAND.  I UNDERSTAND THAT HE DID

14  THAT.  AND I THINK, YOUR HONOR, THE FACT THAT PEOPLE ARE NOT

15  OFTEN PROUD OF THE FACT THAT THEY HAVE IT MAY ALSO BE A REASON

16  WHY PEOPLE DON'T ADMIT TO THAT.

17         I THINK THAT WE ALL KNOW THAT, AND THAT IN FACT THAT'S

18  WHY WE HAVE SUCH STRINGENT REQUIREMENTS ON THE CONFIDENTIALITY

19  OF SOMEONE'S MEDICAL BECAUSE SOMEONE COULD BE AN ELECTED

20  OFFICIAL, OR JUDGE, OR ANYTHING AND NONETHELESS BE TAKING

21  PSYCHOTROPIC MEDICATION AND IT'S NO ONE'S BUSINESS BUT THEIR

22  OWN.

23         HOWEVER, I THINK IT'S IMPORTANT THAT YOUR HONOR

24  UNDERSTAND IN MAKING A DECISION AS TO WHETHER THIS PERSON IS A

25  RISK OF FLIGHT OR A DANGER TO THE COMMUNITY THAT THERE IS, IF

1 RECEIVING PROPER MEDICATION, THAT COULD BE A FACTOR THAT WOULD

2 CAUSE HIM NOT TO BE A RISK OF FLIGHT OR A DANGER TO THE

3 COMMUNITY.  AND OBVIOUSLY IN DOING THE THOROUGH JOB THEY ARE

4 AWARE OF THAT FACT, AND THEY WERE AWARE OF IT DURING THE COURSE

5 OF THEIR INVESTIGATION.

6          THE COURT:  VERY WELL.  YOU CAN CONTINUE WITH YOUR

7 CROSS-EXAMINATION, SIR.

8          MR. NATALE:  THANK YOU.

9 BY MR. NATALE:

10 Q.  NOW, AT ANY TIME DID YOU LEARN THROUGH THE CONFIDENTIAL

11 SOURCE THAT MR. HUBBARD HAD BEEN THE VICTIM OF A FRAUD?

12 A.  HE DID SAY THAT HE SUFFERED A FINANCIAL LOSS SEVERAL YEARS

13 AGO.  I BELIEVE --

14 Q.  FROM WHICH HE NEVER RECOVERED?

15 A.  YEAH.  HE STATED VARIOUS AMOUNTS TO THE SOURCE AT DIFFERENT

16 TIMES.  SO WE WEREN'T SURE OF THE TRUTHFULNESS OF IT.  BUT THAT

17 WAS I THINK WHAT MR. HUBBARD POINTED TO AS A KIND OF TURNING

18 POINT IN HIS LIFE WHEN, YOU KNOW, HE --

19 Q.  QUIT HIS ART, BECAME DEPRESSED, BECAME HOMELESS?

20 A.  I'M NOT SURE OF THE CAUSATION BUT YOU'RE -- THE FACTS

21 YOU'RE ALLUDING TO ARE ACCURATE.

22 Q.  AND, IN FACT, THE CONFIDENTIAL SOURCE EVEN PROVIDED HIM

23 WITH A JOB, DIDN'T HE?

24 A.  THE CONFIDENTIAL SOURCE PROVIDED HIM WITH A JOB?  I BELIEVE

25 HE WORKED AS A DELIVERY DRIVER FOR A SHORT TIME.  AGAIN I WAS

 1  NOT PART OF THE CASE AT THAT POINT.  I COULDN'T --

 2  Q.  YOU ARE AWARE THAT THE DELIVERY DRIVER JOB WAS PROVIDED TO

 3  MR. HUBBARD THROUGH THE CONFIDENTIAL SOURCE.  THAT IS THE

 4  CONFIDENTIAL SOURCE SAYS, I HAVE THIS FRIEND.  HE CAN GIVE YOU

 5  A JOB.  YOU'RE AWARE OF THAT, CORRECT?

 6  A.  THAT SOUNDS REASONABLE, YEAH.

 7       MR. NATALE:  YOUR HONOR, MAY I HAVE JUST ONE SECOND?

 8       THE COURT:  YES, SIR.

 9  BY MR. NATALE:

10  Q.  ONE LAST QUESTION.

11       WERE YOU AWARE OF ANY ILLEGAL ACTS THAT MR. HUBBARD

12  DID WHICH WERE OUTSIDE OF THE PRESENCE OF THE CONFIDENTIAL

13  SOURCE?

14  A.  AGAIN I'M THINKING WHAT -- ARE YOU TALKING WITH REGARD TO

15  THIS CONSPIRACY, THIS PLOT, OR SOMETHING ELSE?

16  Q.  WELL, I HAVE BEEN RESTRICTED TO THIS.  SO I CAN'T --

17  A.  FROM THE CONVERSATIONS THE CONFIDENTIAL SOURCE HAD WITH THE

18  CODEFENDANT MR. CHRISTIAN, I KNOW MR. HUBBARD AND MR. JACKSON

19  DISCUSSED WITH MR. CHRISTIAN THEIR PLOT TO BOMB POLICE.

20  Q.  OKAY.  NOW, THAT IS SOMETHING THAT, IF I UNDERSTAND IT,

21  MR. CHRISTIAN TOLD THE CONFIDENTIAL SOURCE.

22  A.  AFTER THE SOURCE HAD ALREADY LEARNED IT FROM MR. HUBBARD

23  AND MR. JACKSON.

24  Q.  SO MR. HUBBARD HAD PREVIOUSLY TOLD HIM ABOUT THIS PLOT.

25  A.  THAT IS CORRECT.

1   Q.  AND THAT IS THE PLOT THAT YOU'VE ALREADY TESTIFIED TO, HE

2   SAID HE DIDN'T WANT TO HAVE ANYTHING TO DO WITH.

3   A.  YES.  THE FINAL TIME THE SOURCE ASKED HIM ABOUT IT HE HAD

4   CHANGED HIS MIND THAT HE DID NOT WANT TO CONDUCT AN ATTACK

5   BECAUSE HE DID NOT WANT TO RISK GETTING CAUGHT BEFORE TRAVELING

6   TO SYRIA.

7   Q.  AND, IN FACT, THAT'S ONE OF THE THINGS WHICH I THINK YOU

8   TESTIFIED TO WERE NOT PUT IN THE COMPLAINT, RIGHT?

9   A.  THAT IS CORRECT.

10  Q.  NOW, IF I UNDERSTAND IT, IT WAS THAT HE WAS MORE CONCERNED

11  IN LEAVING THE COUNTRY THAN DOING A VIOLENT ACT WITHIN THE

12  COUNTRY, CORRECT?

13  A.  THE STATEMENTS MR. HUBBARD AND THE CODEFENDANTS MADE

14  CONFLICTED WITH THAT REGARD.  IN SOME INSTANCES MR. HUBBARD

15  STATED THAT HE WANTED TO PERMANENTLY RELOCATE TO SYRIA.  IN

16  OTHER INSTANCES THE CONFIDENTIAL HUMAN SOURCE LEARNED FROM BOTH

17  MR. HUBBARD AND MR. CHRISTIAN THAT MR. HUBBARD WOULD

18  POTENTIALLY GO OVER TO SYRIA, TRAIN, AND THEN COME BACK TO THE

19  U.S. TO CONDUCT AN ATTACK.

20  Q.  MY QUESTION, SIR, IS THE CONVERSATION ABOUT BOMBING POLICE,

21  THAT PARTICULAR CONVERSATION, AFTER THAT CONVERSATION, IT WAS

22  MADE CLEAR BY MR. HUBBARD THAT HE DID NOT WANT TO ENGAGE IN

23  THAT, RIGHT?

24       YOU DIDN'T PUT --

25  A.  I'M TRYING TO REMEMBER TRANSCRIPT.  IT WASN'T STATED, I'M

```
 1   NOT -- I DON'T WANT TO DO A BOMBING, OR, I DO NOT WANT TO

 2   ENGAGE IN THAT.  IT WAS, HE DIDN'T WANT TO RISK GETTING CAUGHT.

 3           SO I WOULD HAVE TO GO LISTEN TO THE RECORDING AGAIN TO

 4   SAY THAT HE HAD PERMANENTLY DISAVOWED ANY INTENTION TO CONDUCT

 5   A BOMB ATTACK.

 6   Q.  WELL, AT LEAST AT THAT POINT IN TIME IT WAS MORE IMPORTANT

 7   FOR HIM TO LEAVE THE COUNTRY THAN IT WAS TO RISK BEING CAUGHT

 8   IN THE COUNTRY.

 9   A.  CORRECT.

10   Q.  AND THAT WOULD HAVE BEEN IN THE CONTEXT OF THIS

11   CONVERSATIONS OR TALK ABOUT BOMBING POLICE.

12   A.  CORRECT.

13           MR. NATALE:  I HAVE NO FURTHER QUESTIONS.

14           THANK YOU, YOUR HONOR.

15           THE COURT:  THANK YOU, SIR.

16           ANY REDIRECT?

17                    REDIRECT EXAMINATION

18   BY MR. NUCCI:

19   Q.  SPECIAL AGENT KING, DID MR. HUBBARD EVER EXPRESS TO THE

20   INFORMANT ANY REASONS WHY HE WOULD STAY IN THIS COUNTRY IN

21   CONTRAVENTION TO HIS DESIRE TO LEAVE ON JULY 21ST WHEN HE WAS

22   ARRESTED AT THE AIRPORT?

23   A.  NO.

24   Q.  DID HE INDICATE THAT THERE WAS SOME KIND OF FAMILIAL TIES

25   THAT WOULD KEEP HIM HERE?
```

```
 1   A.  NO, SIR.

 2   Q.  OKAY.  NOW, WHEN YOU SAY, WE HAD HIS PASSPORT AT ONE POINT,

 3   IF HE WANTED TO LEAVE THE COUNTRY THERE ARE OTHER WAYS TO

 4   LEAVE, ARE THERE NOT, THAN USING YOUR PASSPORT.

 5   A.  SURE.  HE COULD GO THROUGH CANADA OR MEXICO.  YOU KNOW,

 6   OBVIOUSLY PEOPLE SLIP INTO THIS COUNTRY VERY EASILY.  YOU COULD

 7   SLIP OUT OF THIS COUNTRY JUST AS EASILY.

 8   Q.  ARE YOU AWARE OF TRAVELERS OR HOME GROWN VIOLENT

 9   EXTREMISTS, MAKING THEIR WAY TO SYRIA OTHER THAN THROUGH A

10   UNITED STATES PASSPORT?

11   A.  ABSOLUTELY.

12   Q.  AND MR. HUBBARD IS SINGLE AT THIS TIME, CORRECT?

13   A.  YES, HE IS.

14   Q.  DID HE EVER EXPRESS THAT, YOU KNOW, THE NEED FOR SOME KIND

15   OF MENTAL TREATMENT DURING THIS WHOLE UNDERCOVER OPERATION?

16   A.  NOT THAT I'M AWARE OF.

17           MR. NUCCI:  THAT'S ALL, YOUR HONOR.

18           THE COURT:  THANK YOU, SIR.

19           YOU MAY BE SEATED, SIR.

20           THE WITNESS:  THANK YOU, YOUR HONOR.

21           THE COURT:  ANY FURTHER EVIDENCE FROM THE GOVERNMENT?

22           MR. NUCCI:  NO, YOUR HONOR.

23           THE COURT:  ANY EVIDENCE FROM THE DEFENSE?

24           MR. NATALE:  NO, YOUR HONOR.

25           WE WOULD JUST RELY ON THE PRETRIAL SERVICES REPORT.
```

1           THE COURT:  THE PRETRIAL SERVICES REPORT DID NOTE ONE

2   CONVICTION, WHICH WAS BACK IN 1982 AT AGE 18 FOR SHOPPING

3   LIFTING WHICH PRODUCED A SENTENCE OF 12 MONTHS PROBATION.

4           THERE ARE NO INDICATION OF ANY VIOLATIONS OF

5   PROBATION, IS THAT CORRECT?

6           MR. NATALE:  YOUR HONOR, I HAVEN'T HAD THE OPPORTUNITY

7   TO CONFIRM THAT OR NOT.  HOWEVER, I THINK AS YOU KNOW THAT THAT

8   WOULDN'T HAVE ANY AFFECT ON ANY COMPUTATION ON THE -- ON HIS

9   SENTENCE.

10          THE ONLY THING THAT I WOULD SUGGEST IS THAT EVEN

11  THOUGH THE MAXIMUM IN THIS CASE IS 20 YEARS HIS GUIDELINE

12  COMPUTATION I BELIEVE IS SOMEWHERE BETWEEN MAYBE FIVE TO SEVEN

13  AND A HALF YEARS.  I DON'T KNOW IF THE GOVERNMENT HAS DONE

14  THAT.

15          BUT, YOU KNOW, JUST LOOKING AT THE BOOK WE KNOW THAT

16  THE GUIDELINE COMPUTATION IS SOMETHING WHICH IS ADVISORY WITH

17  THE COURT AND IN THE VAST MAJORITY OF THE TIMES UNLESS THERE IS

18  SOMETHING UNUSUAL, WHICH BASED ON WHAT WE KNOW NOW ISN'T, HE'S

19  REALLY NOT UNDER THE CURRENT LAW LOOKING AT THE MANDATORY

20  MINIMUM 20 YEARS.

21          THE COURT:  THANK YOU, SIR.

22          DO YOU HAVE ANY OTHER ARGUMENT YOU WANT TO GIVE,

23  MR. NATALE?

24          MR. NATALE:  NO, YOUR HONOR.

25          THE COURT:  VERY WELL.

1           MR. NUCCI, I THINK YOU HAVE MADE A LOT OF YOUR

2    ARGUMENT ALREADY.  ANY FURTHER ARGUMENT YOU WANT TO MAKE, SIR?

3           MR. NUCCI:  NO, YOUR HONOR.

4           THE COURT:  VERY WELL.

5           THIS IS A CASE IN WHICH THE PRESUMPTION OF DETENTION

6    DOES EXIST UNDER THE STATUTE.

7           I WOULD ALSO POINT OUT THAT UNDER THIS PARTICULAR

8    STATUTE, 18 UNITED STATES CODE, SECTION 2339(B), SUBSECTION I

9    OF THAT SECTION SPECIFICALLY NOTES THAT NOTHING IN THIS SECTION

10   SHALL BE CONSTRUED OR APPLIED SO AS TO ABRIDGE THE EXERCISE OF

11   RIGHTS GUARANTEED UNDER THE FIRST AMENDMENT OF THE CONSTITUTION

12   OF THE UNITED STATES.

13          SO THAT IS A FACT THAT -- AND AN INSTRUCTION FROM

14   CONGRESS IN WRITING THE STATUTE THAT THIS COURT IS TAKING

15   COGNIZANCE OF IN MAKING ITS DECISION HERE ABOUT DETENTION.

16          IT'S IMPORTANT IN EVALUATING THIS CASE TO REALIZE THAT

17   FROM ALL THE EVIDENCE THAT I HAVE IN FRONT OF ME TODAY

18   MR. HUBBARD IS A RESPONSIBLE MAN OF MATURE YEARS.  HE IS

19   EXPERIENCED IN THE WORLD.  HE IS NOT AN IMPRESSIONAL YOUNG MAN

20   WHOSE CHARACTER IS BEING FORMED AND MAY HAVE SUCCUMBED TO THE

21   INFLUENCE OF A SIREN SONG.

22          TO EVALUATE THE DANGER MR. HUBBARD POSES TO THIS

23   COMMUNITY WE THEREFORE HAVE TO LOOK AT NOT ONLY HIS ACTIONS BUT

24   AT THE MOTIVATIONS BEHIND HIS ACTIONS TO DETERMINE WHY HE WAS

25   DOING WHAT HE IS DOING.  AND SO, I'M TREADING THAT FINE LINE

1  WITH NOT DOING ANYTHING TO ABRIDGE MR. HUBBARD'S FIRST

2  AMENDMENT RIGHTS IN TRYING TO EVALUATE JUST HOW MUCH OF A

3  DANGER MR. HUBBARD POSES TO THIS COMMUNITY.

4        THERE ARE MANY THINGS THAT ARE FAVORABLE TO

5  MR. HUBBARD IN THE NORMAL CALCULATION OF DETERMINING WHETHER

6  SOMEBODY WOULD GET A BOND OR NOT.  HIS CRIMINAL HISTORY IS

7  ABSOLUTELY MINIMAL.  THERE WAS SHOP LIFTING WHEN HE WAS 18 AND

8  NOTHING SINCE THEN.  THAT'S A PRETTY GOOD SIGN FOR ANYBODY.

9        HE HONORABLY SERVED IN THE UNITED STATES MARINE CORPS

10 AND SERVED HIS COUNTRY AND WAS DISCHARGED WITH AN HONORABLE

11 DISCHARGE, WHICH IS ALSO A POINT IN MR. HUBBARD'S FAVOR.

12       WHILE IT IS TRUE THAT HE DOESN'T HAVE ANY ASSETS RIGHT

13 NOW THAT WE DON'T LOCK EVERYBODY UP BECAUSE THEY ARE POOR,

14 THAT'S NOT A REASON TO DENY PEOPLE BOND.

15       THE REAL ISSUE IN THIS CASE, OF COURSE, IS WHAT THIS

16 CASE IS ALL ABOUT, WHICH IS WHAT MR. HUBBARD'S INTENTIONS ARE

17 AND WHAT HIS -- WHAT IS DRIVING HIS ACTIONS WITH RESPECT TO HIS

18 BELIEF IN JIHAD.  THE COMPLAINT LAYS OUT IN DETAIL MANY ACTIONS

19 WHICH I'M GOING TO GO OVER HERE TODAY.  OKAY.

20       HE USED CODE IN REFERRING TO BOTH ISIL, WHICH HE

21 REFERRED TO AS THE SOCCER TEAM, AND IN JIHAD, WHICH HE REFERRED

22 TO AS PLAYING SOCCER.  AND HE DID THAT IN AN EFFORT TO MAINTAIN

23 HIS ABILITY TO STAY UNDER THE RADAR IN ANY CONVERSATIONS THAT

24 MIGHT BE MONITORED.  THAT'S QUITE CLEAR FROM READING OVER THE

25 COMPLAINT.

1           HE INDICATED THAT THERE WERE ONLY TWO KINDS OF

2   PERSONS.   THERE WAS WITH ISIL AND THOSE AGAINST ISIL.   AND HE

3   INDICATED THAT HE WAS WITH ISIL, AND HE INDICATED IN PARAGRAPH

4   18 OF THIS -- AS STATED IN PARAGRAPH 18 OF THE COMPLAINT THAT

5   THERE MUST BE PRECAUTIONS TO AVOID BEING ARRESTED ON THE WAY TO

6   SYRIA, AND HE WENT ON TO STATE THAT SOMETIMES THE ONLY WAY TO

7   DEAL WITH ONE'S ENEMY IS TO CUT HIS HEAD OFF.

8           HE EXPRESSED HIS FAVORABLE VIEW OF THE SAN BERNARDINO

9   SHOOTING INCIDENT STATING THAT HE DID NOT CARE HOW MANY

10  AMERICANS AND INFIDELS WERE KILLED.   BY MENTIONING BOTH

11  AMERICANS AND INFIDELS I TAKE THAT TO INDICATE THAT AMERICAN

12  MUSLIMS WHO WERE NOT SUPPORTERS OF ISIL, WHICH IS THE

13  OVERWHELMING NUMBER OF AMERICAN MUSLIMS, ALSO PUT IN THAT GROUP

14  OF PEOPLE THAT COULD BE KILLED IN HIS EFFORTS TO HELP ISIL OUT.

15          HE SAID EVERYONE HAS TO DECIDE WHICH SIDE THAT THEY

16  ARE ON, AND THAT HE WAS ON THE WAR -- HE IS ON THE SIDE OF

17  ISIL.   THE CURRENT WAR IN SYRIA JUSTIFIED ACTIONS SUCH AS THOSE

18  IN SAN BERNARDINO, ALSO BY MAJOR NIDAL HASAN, THE SHOOTER IN

19  FORT HOOD.

20          HE DID EXPRESS, AS STATED IN THE GOVERNMENT'S PROFFER,

21  THAT HE WANTS TO BRING AMERICA TO ITS KNEES, AND IT WOULD BE

22  GLORIOUS FOR THE MOVEMENT TO ATTACK THE PENTAGON OR THE WHITE

23  HOUSE.

24          HE BROUGHT A ROUND TRIP TICKET TO SYRIA FOR -- EXCUSE

25  ME, TO EUROPE FOR SECURITY REASONS SO THAT IT WOULD NOT BE SEEN

1  AS A ONE WAY TRIP, AND THUS WOULD BE HEIGHTENING SECURITY.

2      IN FACT, THERE WAS ALSO DISCUSSIONS THEY WOULD WAIT TO

3  BUY THEIR TRAIN TICKET FROM BERLIN TO TURKEY UNTIL THEY GOT TO

4  EUROPE IN AN EFFORT TO STAY UNDER THE RADAR.

5      HE TOOK HIS PERSONAL ITEMS TO A STORAGE UNIT IN

6  GEORGIA, WHICH IS NOT AN UNCOMMON WAY OF SHOWING THE CLOSING OF

7  ONE CHAPTER IN A PERSON'S LIFE AND THE OPENING ANOTHER.

8      HE EXPRESSED HIS APPROVAL OF NOT ONLY THE BEHEADING

9  VIDEOS BUT ALSO A VIDEO SHOWING THE CRUSHING OF THE SKULL OF AN

10  INDIVIDUAL BY ISIL MEMBERS USING A LARGE ROCK.

11      IN SHORT, HIS COMMENTS, AND HIS ACTIONS, HIS TRAINING

12  WITH FIREARMS ALL SHOW A DESIRE TO BE AN ACTIVE WARRIOR IN

13  JIHAD, TO PROCEED TO SYRIA AND RECEIVE TRAINING, AND PERHAPS

14  FIGHT THERE OR PERHAPS COME BACK FROM THERE TO THE UNITED

15  STATES SEEMS TO BE MORE CLEAR, THOUGH, THAT HIS OVERALL

16  INTENTION WAS TO GO TO SYRIA.

17      HE WENT TO MIAMI INTERNATIONAL, GOT A BOARDING PASS

18  FOR A DEPARTURE, AND WAS ARRESTED AS HE WENT THROUGH AFTER

19  CLEARING TSA.

20      ALL OF THESE ACTIONS SHOW A DEDICATED PERSON WHO IS

21  DETERMINED TO WAGE WAR ON THE WEST ON BEHALF OF ISIL.  THERE IS

22  NO COMBINATION OF CONDITIONS THAT I CAN SET THAT WOULD ASSURE

23  PUBLIC SAFETY.

24      I HAVE NO DOUBT THAT IF MR. HUBBARD GOT ANY

25  OPPORTUNITY TO ESCAPE HE WOULD VIEW HIMSELF AS A PRISONER WHO

 1  WAS TRYING TO GET BACK TO THE PEOPLE THAT HE IS SUPPORTING, AND

 2  THOSE PEOPLE THAT HE IS SUPPORTING ARE ISIL.  HE WOULD BE AN

 3  AMERICAN FISH IN AN AMERICAN SEA AND IT WOULD BE EASY FOR HIM

 4  TO MOVE THROUGH THIS COUNTRY AND PERHAPS TRY TO ESCAPE FROM

 5  THIS COUNTRY AND MAKE HIS WAY OVER TO SYRIA.

 6        THE DEFENDANT HAS NOT OVERCOME THE PRESUMPTION.  I

 7  THEREFORE AM GOING TO PRETRIAL DETAIN HIM AS BOTH A RISK OF

 8  FLIGHT AND A DANGER TO THE COMMUNITY.

 9        THERE ARE ABSOLUTELY NO CONDITIONS THAT I CAN SET THAT

10  WOULD GUARANTEE THE SAFETY -- EXCUSE ME, REASONABLY ASSURE THE

11  SAFETY OF THE COMMUNITY, AND THERE ARE NO CONDITIONS THAT I

12  COULD SET THAT WOULD REASONABLY ASSURE THAT HE WOULD NOT MAKE

13  EVERY EFFORT TO ESCAPE AND JOIN WHAT HE VIEWS AS HIS

14  COMPATRIOTS OVER IN SYRIA.

15        IN LIGHT OF THAT HE IS PRETRIAL DETAINED.

16        ANYTHING FURTHER ON MR. HUBBARD'S CASE TODAY?

17        MR. NATALE:  NOTHING FROM THE DEFENSE, YOUR HONOR.

18        THE COURT:  FROM THE GOVERNMENT?

19        MR. NUCCI:  NOTHING, YOUR HONOR.  THANK YOU.

20        THE COURT:  VERY WILL.

21        THEN WE ARE IN RECESS.

22                            - - -

23

24

25

1

2

3                      C E R T I F I C A T E

4

5

6  UNITED STATES OF AMERICA

7  SOUTHERN DISTRICT OF FLORIDA

8

9

10         I, CARL SCHANZLEH, OFFICIAL COURT REPORTER OF THE UNITED

11  STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA, DO

12  HEREBY CERTIFY THAT THE FOREGOING 58 PAGES CONSTITUTE A TRUE

13  TRANSCRIPT OF THE PROCEEDINGS HAD BEFORE THE SAID COURT HELD IN

14  THE CITY OF WEST PALM BEACH, FLORIDA, IN THE MATTER THEREIN

15  STATED.

16         IN TESTIMONY WHEREOF, I HEREUNTO SET MY HAND ON THIS

17  16TH DAY OF AUGUST 2016.

18

19                          /S/CARL SCHANZLEH
                            CARL SCHANZLEH, RPR-CM
20                          CERTIFIED COURT REPORTER
                            9960 SW 4TH STREET
21                          PLANTATION, FL 33324
                            TELEPHONE 954 424-6723
22

23

24

25